# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued October 13, 2006          Decided January 12, 2007

No. 04-1148

NATIONAL ASSOCIATION OF REGULATORY UTILITY
COMMISSIONERS, ET AL.,
PETITIONERS

V.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

TENASKA, INC., ET AL.,
INTERVENORS

———

Consolidated with
04-1149, 04-1152, 05-1050, 05-1292

———

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

———

*Laurence G. Chaset* argued the cause for Governmental
Petitioners. With him on the briefs were *James Bradford
Ramsay*, *Thomas D. Samford, IV*, *Arocles Aguilar*, *Aubrey
Williams Turner, Jr.*, *Gisele Lunsford Rankin*, *Florence P.
Belser*, and *Robert D. Cedarbaum*.

*Andrew W. Tunnell* argued the cause for Utility Petitioners. With him on the brief were *S. Chris Still*, *Kevin A. McNamee*, *Neil H. Butterklee*, *John D. McGrane*, *Heath K. Knakmuhs*, and *Antoine P. Cobb*.

*Lona T. Perry*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were *Robert H. Solomon*, Solicitor, and *Samuel Soopper*, Attorney.

*Ashley C. Parrish* argued the cause for intervenors Tenaska, Inc., et al. With her on the briefs were *Neil L. Levy*, *Jennifer L. Key*, *Glen L. Ortman*, *Harvey L. Reiter*, and *Jonathan D. Schneider*. *Gregory O. Olaniran* entered an appearance.

Before: SENTELLE, *Circuit Judge*, and EDWARDS and WILLIAMS, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

Opinion dissenting in part filed by *Circuit Judge* SENTELLE.

WILLIAMS, *Senior Circuit Judge*: In 1996 the Federal Energy Regulatory Commission issued Order No. 888 in the hopes of fostering competition in the electric generating industry. Such competition clearly depended on generators' having adequate means of getting their power to market. FERC's solution in Order No. 888 was to require transmission providers, which typically have a natural monopoly, to give generators equal access to transmission facilities. The Commission implemented the requirement in part by mandating the filing of suitable tariffs. See *Transmission Access Policy Study Group v. FERC*, 225 F.3d 667, 682–83

(D.C. Cir. 2000) ("*TAPS*"). We affirmed Order No. 888 in *TAPS*.

In the period directly after issuing Order No. 888, FERC had monitored one element of the process—the interconnection agreements between operators of generators and transmission facilities—on a case-by-case basis. Finding that approach "inadequate" and "inefficient," FERC issued Order No. 2003 and three successive rehearing orders. *Standardization of Generator Interconnection Agreements and Procedures*, Order No. 2003, 104 F.E.R.C. ¶ 61,103 at 30,430 P 10 (2003), *order on reh'g*, Order No. 2003-A, 106 F.E.R.C. ¶ 61,220 (2004), *order on reh'g*, Order No. 2003-B, 109 F.E.R.C. ¶ 61,287 (2004), *order on reh'g*, Order No. 2003-C, 111 F.E.R.C. ¶ 61,401 (2005). In the interests of achieving transparency and preventing transmission facility owners from favoring affiliated generators over independents in interconnection, the orders require all transmission facilities to adopt a standard agreement for interconnecting with generators larger than 20 megawatts.

Here we review claims advanced by two sets of petitioners (the two sets are generally aligned with each other in their positions): four utilities ("Utility Petitioners") and six state regulatory agencies (together with an association of such agencies, the National Association of Regulatory Utility Commissioners) ("Governmental Petitioners"). They challenge Order No. 2003 and its sequels on the grounds that FERC exceeded its jurisdiction, unlawfully commandeered states, departed from its own precedent without explanation, and made policy decisions that are arbitrary and capricious. We reject all of these claims and affirm the orders.

4

\* \* \*

Petitioners raise a succession of claims that FERC's orders usurp jurisdiction not provided by Congress. FERC's interpretations of the jurisdictional provisions of the Federal Power Act (the "Act") enjoy *Chevron* deference. *Detroit Edison Co. v. FERC*, 334 F.3d 48, 53 (D.C. Cir. 2003) (citing *TAPS*, 225 F.3d at 694).

Section 201(b)(1) of the Act makes the statute applicable to "the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce" and gives FERC jurisdiction not only over such transmission and sales but also over "all facilities for such transmission or sale of electric energy." 16 U.S.C. § 824(b)(1). At the same time the Act precludes FERC "jurisdiction . . . over facilities used in local distribution or only for the transmission of electric energy in intrastate commerce." *Id*. Order No. 2003 asserts jurisdiction over the terms of interconnection between generators and transmission providers, even where the transmission facility also engages in local distribution, but only insofar as the interconnections are "for the purpose of making sales of electric energy for resale in interstate commerce." Order No. 2003 at 30,545–46 P 804. Utility Petitioners claim that this represents an unlawful exercise of jurisdiction over dual-use facilities—ones that engage in both transmission and local distribution.

Petitioners believe that our opinion in *Detroit Edison* controls. There we rejected FERC's attempt to assert jurisdiction over unbundled retail service, although such service involved neither jurisdictional sales nor jurisdictional transmission. Sales under FERC-jurisdictional tariffs would have enabled the shipper to escape stranded cost charges imposed under state-approved tariffs. 334 F.3d at 52. FERC's purported jurisdictional hook was that the power was

being shipped over dual-use facilities that provided both retail and wholesale distribution services. *Id*. at 52, 54. We were unconvinced by this theory for asserting jurisdiction over non-jurisdictional transactions.

Here the issue is the inverse of *Detroit Edison*; Order No. 2003 applies to jurisdictional transactions only. FERC determined that the provisions of Order No. 2003 should apply "to interconnections to the facilities of a public utility's Transmission System that, at the time the interconnection is requested, may be used either to transmit electric energy in interstate commerce or to sell electric energy at wholesale in interstate commerce." Order No. 2003-C at 31,656 P 51. "Interconnections," though seemingly not defined explicitly in the orders, clearly are not "facilities," as that would make the term "Interconnection Facilities," as used in the standardized agreements, a redundancy. See, e.g., Order No. 2003 at 30,577. In fact interconnections appear to be relationships between parties with respect to electricity flowing over facilities, and the orders here by their terms control the agreements governing those relationships. See, e.g., "Standard Large Generator Interconnection Agreement (LGIA)," *id*. at 30,616–67. By establishing standard agreements FERC has exercised its jurisdiction over the *terms* of those relationships. Cf. *TAPS*, 225 F.3d at 696 ("FPA § 201 makes clear that *all aspects* of wholesale sales are subject to federal regulation, regardless of the facilities used." (emphasis added)).

In their reply briefs petitioners note that the orders regulate certain facets of the engineering and construction of facilities needed for the relevant transmissions. Utility Petitioners' Reply Br. at 4; Governmental Petitioners' Reply Br. at 5–6 & n.9. But petitioners identify no specific aspect of the regulations that they claim is untethered to the Commission's authority over interstate transmissions and

wholesale sales. As FERC's authority generally rests on the public interest in constraining exercises of market power, see *Associated Gas Distributors v. FERC*, 824 F.2d 981, 1003 (D.C. Cir. 1987), whether in the utility's rates or other service terms, and as a common test for the lawfulness of rates is their connection to the reasonably-incurred costs of providing the regulated service, *National Fuel Gas Supply Corp. v. FERC*, 900 F.2d 340 (D.C. Cir. 1990), it is hard to see how the statute could leave FERC weaponless against conduct that might encourage or cloak the running up of unreasonable costs. The Commission's indisputable authority to disallow recovery of costs imprudently incurred by jurisdictional firms may, of course, impinge as a practical matter on the behavior of non-jurisdictional ones. So far as appears, petitioners in this facial attack have identified no impingement that exceeds what may be encompassed in such conventional exercises of jurisdiction.

Utility Petitioners also dispute FERC's assertion of jurisdiction over facilities jointly owned by private firms and states. This presents questions analogous to those raised by the transmission-and-distribution facilities just discussed, though here the divide is between private and public ownership rather than between transmission and distribution. Section § 201(f) of the Act provides that "[n]o provision in this subchapter shall apply to, or be deemed to include, the United States, a State or any political subdivision of a State." 16 U.S.C. § 824(f). (They are brought back in with respect to particular sections not relevant here. See §3(22) of the Act, 16 U.S.C. § 796(22); §§ 210–213, 16 U.S.C. §§ 824i–824l; *Bonneville Power Administration v. FERC*, 422 F.3d 908, 916 (9th Cir. 2005).) Therefore, according to petitioners, FERC may not regulate jointly-owned facilities. Although Order No. 2003 explicitly states that it applies only "to Interconnection Service provided by the public utility on its portion of a jointly owned facility," Order No. 2003 at 30,546

P 807, petitioners claim that FERC's purported distinction is not possible. In their view, an interconnection affects an entire facility, not simply the public utility's portion, and FERC's purported exercise of authority over the service therefore violates § 201(f). The argument fails for reasons similar to those discussed in the context of FERC's authority to regulate jurisdictional transactions occurring over non-jurisdictional facilities.

Any proper construction of § 201 must give effect to both FERC's jurisdiction over certain transactions occurring over public utilities and to § 201(f)'s exclusion of state facilities. As FERC notes in its brief, jurisdictional utilities should not be able, without linguistic support from Congress, to escape regulation "simply by partnering with non-jurisdictional utilities." Respondent's Br. at 32. FERC navigated a similar problem in Order No. 888, which required equal access to transmission services. There the Commission stated clearly that it had authority to regulate a public utility, notwithstanding incidental effects on nonjurisdictional entities:

> The fact that a public utility may jointly own, with a non-jurisdictional entity, transmission facilities through which it engages in sales for resale and/or transmission of electric energy in interstate commerce does not alter the Commission's authority to regulate that public utility. . . . The fact that . . . an order may affect a non-jurisdictional joint owner does not undermine the validity of the Commission's order.

Order No. 888-A, FERC Stats. & Regs. ¶ 61,182 at 30,219, 62 Fed. Reg. 12,274, 12,300/2 (Mar. 4, 1997). FERC relied on the same logic in Order No. 2003. See Order No. 2003 at 30,546 P 807. Utility Petitioners accept the validity of Order No. 888 as well as other cases that they view as

distinguishable from the present situation. See, e.g., *Mid-Continent Area Power Pool*, 89 F.E.R.C. ¶ 61,135 at 61,387–88 (1999); *Bonneville Power*, 422 F.3d at 925.

According to petitioners, however, Order No. 888 affected the non-jurisdictional entities only in the sense of invalidating contractual provisions between jurisdictional and non-jurisdictional co-owners, whereas Order No. 2003 "addresses the request for and construction of facilities . . . by a non-jurisdictional co-owner." Utility Petitioners' Reply Br. at 5–6. The supposed distinction is of no account, however. As discussed above, assertion of jurisdiction over specified transactions, even though affecting the conduct of the owner(s) with respect to its facilities, is not per se an exercise of jurisdiction over the facility. The contract modifications mandated in Order No. 888, forcing the non-jurisdictional owner to permit certain transactions to occur over the jointly owned facility, obviously affected that owner's ownership rights in, and conduct with respect to, the facility; the modifications removed a hitherto valid veto power over the use in question. To the extent that Order No. 2003 conditions a jurisdictional utility's participation in the transmission and interconnection markets on that utility's securing physical changes in the facilities, and those changes bear a close enough relation to FERC's exercise of jurisdiction over jurisdictional transactions (petitioners pose no challenge to the adequacy of that relation), the Order effects no legally material extension of the authority exercised in Order No. 888.

The Governmental Petitioners challenge FERC's articulation of its assertion of jurisdiction over interconnections with dual-use facilities (ones for transmission and local distribution)—namely, FERC's claim of authority where such facilities are "used to transmit electric energy in interstate commerce on behalf of a wholesale

purchaser pursuant to a Commission-filed OATT [Open Access Transmission Tariff]." Order No. 2003 at 30,545–46 P 804. See also Order No. 2003-A at 31,071–72 P 710. Governmental Petitioners claim that this involves jurisdictional "boot-strapping." They cite our opinion in *Columbia Gas Transmission Corp. v. FERC*, 404 F.3d 459 (D.C. Cir. 2005), where FERC had asserted jurisdiction based solely on a voluntarily filed tariff "even if FERC would not otherwise have jurisdiction." *Id*. at 461. Here we have the exact opposite of boot-strapping. FERC is exercising jurisdiction only over "interconnections to a 'distribution' facility when the facility is included in a public utility's Commission-filed OATT *and* the interconnection is for the purpose of facilitating a jurisdictional wholesale sale of electric energy." Order No. 2003-A at 31,075 P 730 (emphasis added).

Governmental Petitioners also object that FERC's approach creates uncertainty by making jurisdiction turn on (among other things) whether the facility is covered by an OATT. FERC acknowledged the potentiality for uncertainty, but reasoned that most cases would present no controversy and that, if a dispute should arise, it would depend in the first instance on the transmission provider to make the relevant information available to potential interconnecting customers. Order No. 2003-A at 31,072 P 712. On the record before us, we see no grounds for upsetting the Commission's judgment.

Closely related to the jurisdictional claims is the Governmental Petitioners' assertion that FERC erred by not applying its seven-factor test, which we approved in *TAPS*, 225 F.3d at 696, to determine whether a facility is an exempt local distribution facility or a covered transmission facility. But here, as often mentioned above, at least with regard to the exercises of power disputed before us, FERC is exerting jurisdiction over transactions, based on the transactions'

satisfaction of the Act's jurisdictional criteria. It thus has had no occasion to decide whether a facility as such should be classified as jurisdictional or not.

* * *

In its proposal leading to Order No. 2003 FERC had contemplated requiring transmission providers to use reasonable efforts, including available "eminent domain authority, if necessary, to facilitate the interconnection" of generators. See Order No. 2003 at 30,483 P 384. Responding to comments suggesting that the requirement would unduly burden transmission firms, *id*. at 30,484 P 391, FERC reduced this to a provision forbidding such firms from discriminating in the exercise of eminent domain powers to the detriment of independent generators and to the advantage of affiliates. See, e.g., Order No. 2003-A at 31,003 P 298. Utility Petitioners object that these provisions of Order No. 2003 and its sequels impermissibly "commandeer" states' eminent domain authority, contrary to the Supreme Court's holdings in *New York v. United States*, 505 U.S. 144 (1992), and *Printz v. United States*, 521 U.S. 898 (1997). Whether FERC has commandeered states is a question of law that we review de novo.

The orders here are a far cry from what the Supreme Court found objectionable in *New York* and *Printz*. In *New York*, the Court invalidated a provision of the Low-Level Radioactive Waste Policy Amendments of 1985 that gave states a Hobson's choice: either take title to low-level radioactive waste generated by third parties or regulate the waste pursuant to Congress's direction. Congress didn't have authority to impose either option on states directly and thus could not force states to choose one or the other. The Court emphasized that Congress may not "commandeer" states by

compelling them either to create or administer a federal regulatory scheme. 505 U.S. at 174–77. In *Printz* the Court found that *New York*'s anti-commandeering principle precluded a provision of the Brady Handgun Violence Prevention Act requiring local law enforcement officers to help conduct background checks on individuals seeking to purchase a firearm. 521 U.S. at 933.

We recognize that a state's authority to exercise the eminent domain power, and to license public utilities to do so, is an important state power. But FERC has done nothing more than impose a non-discrimination provision on public utilities. The orders explicitly leave state law untouched, specifying that any exercise of eminent domain by a public utility pursuant to the orders' non-discrimination mandate be "consistent with state law." Order No. 2003-A at 31,144, LGIA § 5.13; see also *id*. at 31,004 P 300. Thus the states remain completely free to continue licensing public utilities to exercise eminent domain, or to discontinue that practice. To be sure, if hitherto a utility would not have exercised eminent domain to enable interconnection with an independent generator, the orders, conditionally, compel the utility either to broaden its use of the state-provided authority for the benefit of independents, or to drop the use for its own and its affiliates' power. But the modifier *conditionally* is critical. Nothing in the federal rule compels either continued state retention of the license, or public utilities' continued employment of eminent domain. The intrusion on state power is surely no greater than (many would say dramatically less than) that of a federal command that, if a state hires employees for the performance of traditional governmental functions, it must pay them no less than a federally determined wage. See *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528 (1985). Moreover, we believe that our dissenting colleague's focus on the "plain statement" requirement that applies to purported federal

creation of state obligations is misplaced; the orders here leave state law completely undisturbed and bind only utilities—not state officials.

Related to Utility Petitioners' "commandeering" claim is their assertion that Order No. 2003-A involves an unlawful taking. They concede, as they must, that the Order explicitly requires that any uses of eminent domain by transmission providers be at the expense of the benefiting generator. Order No. 2003-A at 31,003 P 298. But the Utility Petitioners claim that exercising eminent domain power on behalf of independent generators could undermine transmission providers' "good will" in their relation to landowners. Assuming that that is so, we note that petitioners make no claim that the injury to such good will is any more severe than the one inflicted by uses of eminent domain for interconnection to affiliated generators. Anti-discrimination rules commonly require the incurrence of costs by the obligated parties; their very imposition presupposes that some such parties would, in pursuit of their self-interest, violate the anti-discrimination norm. We cannot see that the potential loss of good will rises above the sort of costs commonly inflicted by such mandates.

* * *

The remaining significant challenge, brought by both sets of petitioners, is to the so-called "At or Beyond" rule. The rule is intended to guide assignment of costs as between a transmission facility and an interconnecting generator. Under the rule, "the Interconnection Customer [is] solely responsible for the costs of Interconnection Facilities, which are defined as all facilities and equipment between the Generating Facility and the Point of Interconnection with the Transmission System. Network Upgrades, which are defined as all facilities

and equipment constructed *at or beyond* the Point of Interconnection for the purpose of accommodating the new Generating Facility," are (ultimately) the responsibility of the "Transmission Provider." Order No. 2003 at 30,518–19 P 676 (emphasis added).

Petitioners claim that the "At or Beyond" rule departs from the Commission's own precedents, is based on factual conclusions unsupported by substantial evidence, and is otherwise arbitrary or capricious. In our review we defer to an agency's reasonable application of its own precedents and uphold factual conclusions supported by substantial evidence. See *Williams Gas Processing – Gulf Coast Co., L.P. v. FERC*, 373 F.3d 1335, 1341 (D.C. Cir. 2004). We reject all of these assertions.

In their claim of departure from precedent, petitioners point to our decision in *Entergy Services, Inc. v. FERC*, 391 F.3d 1240 (D.C. Cir. 2004). There we considered whether FERC's use of the "At or Beyond" rule in the decision under review represented a departure from an earlier FERC decision, *Consumers Energy Co.*, 95 F.E.R.C. ¶ 61,233 (2001), in which FERC had used a "From" test to differentiate between Network Upgrades and Interconnection Facilities, assigning the transmission provider only the costs for "facilities *from* the point where the generator connects to the grid," *id*. at 61,804 (emphasis added). In *Entergy* we explicitly observed that the two tests might be fully consistent, see *Entergy*, 391 F.3d at 1249, 1251, but we thought that the difference in language was potentially significant and that FERC had failed to adequately explain its precedents, see *id*. at 1251.

In its order on remand from *Entergy*, *Nevada Power Co.*, 113 F.E.R.C. ¶ 61,007 (2005), the Commission explained both the relation between the two labels and prior anomalies in its rulings. In essence, it said that "From" was a vague term and

14

that "At or Beyond" was simply "clearer terminology" that offered "a more precise way" of explaining FERC precedent. *Id*. at 61,013 P 12. And, acknowledging some past anomalies (principally in *Consumers Energy*), in which it had assigned to the interconnecting generator the cost of some facilities at the actual point of interconnection, it explained that "the issue was not raised, and the Commission did not discuss it or rule on it." *Id*. at 61,013 P 13; see also *id*. at 61,014 PP 14–15. We note that since then the Commission has continued to adhere to the "At or Beyond" approach. See *Duke Energy Hinds, LLC*, 117 F.E.R.C. ¶ 61,210 at *5 P 23 (2006). In short, the "At or Beyond" rule can no longer be considered an unexplained departure from FERC precedent.

Petitioners also contend that the "At or Beyond" rule violates the basic "cost causation" principle, under which costs are to be allocated to those who cause the costs to be incurred and reap the resulting benefits. But FERC has long taken the view that customer "but-for" causation isn't dispositive of this issue. "[E]ven if a customer can be said to have caused the addition of a grid facility, the addition represents a *system* expansion used by and benefitting *all* users due to the integrated nature of the grid." *Public Service Co. of Colorado*, 62 F.E.R.C. ¶ 61,013 at 61,061 (1993). (Indeed, for purposes of marginal cost pricing, all customers cause the incurrence of the costs associated with coincident peak load, whether by adding or merely continuing their usage. *Town of Norwood, Mass. v. FERC*, 962 F.2d 20, 24 n.1 (D.C. Cir. 1992).) We have endorsed the approach of "assign[ing] the costs of system-wide benefits to all customers on an integrated transmission grid." *Western Massachusetts Electric Co. v. FERC*, 165 F.3d 922, 927 (D.C. Cir. 1999).

Utility Petitioners take issue, however, with the empirical conclusion that Network Upgrades benefit the entire network. They point to an affidavit by James E. Howell, Jr., an

administrator with Southern Company Services, who claimed that the addition of unnecessary new facilities causes interruptions with power lines and decreases the network's reliability. Utility Petitioners object that because FERC did not address the Howell Affidavit directly, the Commission's factual conclusions are unsupported by substantial evidence. The doctrine obliging agencies to address significant comments leaves them free to ignore insignificant ones. See *Troy Corp. v. Browner*, 120 F.3d 277, 289 (D.C. Cir. 1997). The evidence to which the petitioners point is one conclusory paragraph that offers no specific basis for undermining the Commission's long-held understanding that Network Upgrades provide system-wide benefits. FERC said as much in Order No. 2003-B, referring to the contents of the Howell Affidavit as "unsupported hypothetical generalizations." Order No. 2003-B at 31,292 P 56. Though the modifier "hypothetical" is inaccurate (the paragraph asserts flat out, for example, that "installation of a new substation . . . results in the affected transmission line being less reliable"), Howell's generalizations are indeed unsupported, and thus insufficient (on their own) to draw in question the factual premises underlying the Commission's cost assignment practice.

Both sets of petitioners argue that the "At or Beyond" rule is inconsistent with FERC's obligation to ensure efficient siting of facilities pursuant to § 212 of the Act, 16 U.S.C. § 824k, added by the Energy Policy Act of 1992. In pursuit of this claim Governmental Petitioners misquote § 212(a) as saying that the rates and terms in question must "promote the economically *efficient siting* of transmission and generation of electricity." Governmental Petitioners' Br. at 35 (emphasis added). The word "siting" in fact appears nowhere in the relevant section. In reality the statute requires that rates "promote the economically efficient transmission and generation of electricity." 16 U.S.C. § 824k(a). No matter; FERC has understandably identified efficient siting as one of

its goals in administering the statute. *Pricing Policy for Transmission Services; Policy Statement*, 59 Fed. Reg. 55,031, 55,035 (Oct. 26, 1994).

Petitioners' argument is essentially that assignment to the transmission owner of the costs of facilities located at or beyond the point of interconnection creates an improper incentive. This is in essence a variation on petitioners' argument that the "At or Beyond" rule violates cost causation principles. Recall that the rule sticks generator owners with the *entire* cost of the link between the generator and the transmission facility; that, presumably, is the cost most affected by siting choices. Siting also will affect the economic viability of the interconnection upgrades. Order 2003-B at 31,288 PP 32, 33. As to these, the orders require the generator to supply the upfront financing; more important, they call for a rate structure that imposes on the generator most or all of the risk of non-recovery. Order No. 2003-A at 31,054 P 613. We see no substantial basis for petitioners' siting incentive theory.

\* \* \*

Petitioners' remaining objections concern the effectuation of the larger policies we've already discussed. These are questions of agency policy that we would overturn only if the Commission's decisions were arbitrary or capricious. 5 U.S.C. § 706(2)(A). Having carefully considered petitioners' arguments and FERC's explanations of its policies in the orders under review, we see no basis for any such finding. The issues do not merit discussion in a published opinion.

\* \* \*

For the foregoing reasons, we uphold Orders No. 2003, 2003-A, 2003-B, and 2003-C against all objections raised by petitioners.

*So ordered.*

SENTELLE, *Circuit Judge*, dissenting in part: I concur in most of the majority's opinion, but I cannot join that part of the opinion that upholds the eminent domain provisions of Order No. 2003. *See* Maj. Op. 10-12. FERC is a "creature of statute," and the agency has "*only* those authorities conferred upon it by Congress." *Cal. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 398 (D.C. Cir. 2004) (internal quotation marks omitted). "[A]n agency literally has no power to act . . . unless and until Congress confers power upon it." *Id.* (quoting *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)). I do not believe that Congress has authorized FERC to regulate the use of state-granted eminent domain power, and thus I respectfully dissent from that portion of the majority's opinion.

\* \* \*

Under FERC's new Standard Large Generator Interconnection Agreement, transmission providers are required to take certain steps to help generators obtain necessary land for interconnection facilities. Transmission providers "shall at Interconnection Customer's expense use efforts, similar in nature and extent to those that it typically undertakes on its own behalf or on behalf of its Affiliates, including use of its eminent domain authority." Order No. 2003-A, 69 Fed. Reg. 15,932, 15,953-54, 16,033 (2004). In other words, to the extent that transmission providers use eminent domain to interconnect with their own generation facilities, they must now use eminent domain on behalf of unaffiliated generators as well. The issue before us is whether FERC has statutory authority to regulate transmission providers' use of state-granted eminent domain power, and – if FERC does have such authority – whether the provisions of Order No. 2003 that address eminent domain are constitutional.

Courts may not presume that Congress has intended to regulate the "substantial sovereign powers" of states unless the federal statute in question is unmistakably clear. The Supreme Court has held that "if Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute." *Gregory v. Ashcroft*, 501 U.S. 452, 460-61 (1991) (quoting *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242 (1985)) (internal quotation marks omitted). "This plain statement rule is nothing more than an acknowledgment that the States retain substantial sovereign powers under our constitutional scheme, powers with which Congress does not readily interfere." *Gregory*, 501 U.S. at 461. Courts have applied this clear statement rule in a variety of cases involving federal regulation of the "substantial sovereign powers" of the states. *See, e.g., Raygor v. Regents of Univ. of Minn.,* 534 U.S. 533, 543-44 (2002) (whether the federal supplemental jurisdiction statute tolls the statutes of limitation for state law claims in state court); *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 73-74 (2000) (whether a federal statute abrogates state sovereign immunity); *Gregory*, 501 U.S. at 461-67 (whether the federal Age Discrimination in Employment Act applies to state judges); *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65 (1989) (whether states are "persons" that may be sued under 42 U.S.C. § 1983); *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947) (whether a federal statute preempts state law); *Am. Bar Ass'n v. FTC*, 430 F.3d 457, 471-72 (D.C. Cir. 2005) (whether a federal statute should be interpreted to regulate the practice of law, which has long been regulated at the state level).

I believe that eminent domain is easily classified as a "substantial sovereign power" of the states, and thus the clear statement rule applies to federal regulation of this power. Courts have long recognized that eminent domain is at the very

core of state sovereignty. As the Supreme Court has stated:

> The power of eminent domain is an attribute of sovereignty, and inheres in every independent state. . . . The taking of private property for public use upon just compensation is so often necessary for the proper performance of governmental functions that the power is deemed to be essential to the life of the state. It cannot be surrendered, and if attempted to be contracted away, it may be resumed at will.

*Georgia v. City of Chattanooga*, 264 U.S. 472, 480 (1924). *See also Jackson v. Metro. Edison Co.*, 419 U.S. 345, 353 (1974) (noting that eminent domain "is traditionally associated with [state] sovereignty"). Courts have also emphasized that even if eminent domain authority has been delegated to a public utility or a privately-owned corporation, it is still the *state* that is acting whenever the eminent domain power is used:

> The right of eminent domain is an attribute of sovereignty. . . . It is none the less a public right, because the state sometimes consents that it may be exercised by a quasi public corporation, like a common carrier. Such license or permission is granted because its exertion in that form is thought to be for the public interest. . . . It permits them to proceed in their own names, but really on behalf of the state . . . .

*Louisville & N.R. Co. v. W. Union Tel. Co.*, 268 F. 4, 8 (6th Cir. 1920). *See also Baldwin v. Appalachian Power Co.,* 556 F.2d 241 (4th Cir. 1977) ("By exercising the delegated power of eminent domain, a public service corporation acts as an agent of the state . . ."); *Louisiana v. Chambers Inv. Co.,* 595 So.2d 598, 601 (La. 1992) ("[Eminent domain] always involves the taking or damaging of property interests by the state or some alter ego of the state, such as a public utility, that has been delegated the

power to condemn."); *Wissler v. Yadkin River Power Co.*, 74 S.E. 460, 460 (N.C. 1912) ("This power of eminent domain is conferred upon corporations affected with public use, not so much for the benefit of the corporations themselves, but for the use and benefit of the people at large."). Thus, eminent domain is properly categorized as a "substantial sovereign power" of the states, even when that power has been delegated to a public utility. Accordingly, we should not presume that Congress intended to regulate the use of state eminent domain authority unless the federal statute in question is "unmistakably clear."

Turning to the instant case, Order No. 2003 will require transmission providers either to forego the use of their state-granted eminent domain power altogether, or to use this power to condemn property on behalf of unaffiliated generators. These provisions of Order No. 2003 cannot possibly be lawful unless Congress has "unmistakably" authorized FERC to regulate the use of state-granted eminent domain power. FERC has not identified – and I have not found – any such clear statement of congressional intent in the relevant statutes. The federal statutes pertaining to the "regulation and development of power" are codified in title 16 of the U.S. Code. *See* 16 U.S.C. §§ 791-839. Noticeably absent from these sections of the Code is any provision granting FERC authority to dictate the manner in which state eminent domain power may be used.

Congress's treatment of eminent domain in other provisions of the energy statutes confirms that we should not infer from FERC's general grant of jurisdiction that the agency also has the power to regulate state eminent domain. When Congress addresses issues involving eminent domain, it tends to do so in a clear, detailed, and specific manner. *See* 16 U.S.C. § 824a-4(a) (granting the Secretary of Energy limited authority to use eminent domain to acquire rights-of-way "through North Dakota, South Dakota, and Nebraska for transmission facilities

for the seasonal diversity exchange of electric power to and from Canada"); *id.* § 824p(e) (granting eminent domain authority to certain licensees to build transmission facilities in "national interest electric transmission corridor[s]"); *id.* § 814 (granting eminent domain authority to certain licensees to acquire land "necessary to the construction, maintenance, or operation of any dam, reservoir, diversion structure, or the works appurtenant thereto"); *id.* § 831c(h)-(i) (authorizing the TVA to use eminent domain to "acquire real estate for the construction of dams, reservoirs, transmission lines, power houses, and other structures, and navigation projects at any point along the Tennessee River"). Although these provisions address federal eminent domain authority – rather than FERC's power to regulate state eminent domain – they nonetheless show the specificity that Congress uses when it addresses eminent domain. These provisions reinforce my conclusion that FERC's jurisdiction over interstate transmission and wholesale sales of electric energy does not include – *sub silentio* – the authority to regulate state eminent domain.

\* \* \*

Under well-established principles of statutory interpretation, courts should not presume that Congress has intruded upon a core area of state sovereignty unless the relevant federal statute is clear and unambiguous. Here, FERC has not identified any federal statute that clearly authorizes the Commission to regulate the use of state eminent domain power. Thus, I would hold that the provisions of Order No. 2003 that impose restrictions on transmission providers' use of state-granted eminent domain power are beyond the scope of FERC's statutory authority. Because I would resolve this issue on statutory grounds, I do not need to address the constitutional issue of "commandeering." Of course, in the future, Congress might pass a statute that specifically authorizes FERC to

regulate how transmission providers use their eminent domain power. Such a statute may raise constitutional issues under *New York v. United States*, 505 U.S. 144 (1992), and *Printz v. United States*, 521 U.S. 898 (1997), but those issues are not before us at this time.

For the aforementioned reasons, I respectfully dissent from the portions of the majority opinion that address the eminent domain provisions of Order No. 2003. I join the remainder of the majority's opinion.