ROGERS, Circuit Judge,
dissenting:
After the Federal Regulatory Commission rejected a transmission owner’s request for unilateral authority to select the funding method for “network upgrades,” certain transmission owners (hereinafter “Ameren”) did not prevail on rehearing and now petition for review of five orders of the Commission.[1] In those orders, the Commission addressed the recovery of capital costs and determined there were three fundamental problems with allowing transmission owners unilateral discretion to select the method of funding network upgrades. First, “it [would] allow[] the transmission owner ... [to] subsequently assess the interconnection customer [hereinafter “generator”] a network upgrade charge that is not later reimbursed ..., which may result in discriminatory treatment by the transmission owner of different [generators].” June 2015 Order P 48. Second, it would allow the transmission owner to “deprive the [generator] of other options to finance the cost of the network upgrades that provide more favorable terms and rates.” Id. Third, in contrast to generator funding in which the generator posts security over the term of construction, transmission owner funding would require “the [generator] to post security ... over the term of the construction phase and over the term of the” contract. Id. P *586 49. Such increased costs, the Commission found, may “frustrate > the development of new, competitive generation, which would contradict a stated purpose of Order No. 2003.” Id, Indeed, adding such cost “with no corresponding increase in service,” the Commission observed, “shares similar characteristics” to a 'funding option that the Commission had eliminated as unjust and unreasonable. Id. (citing E.ON Climate & Renewables North America, LLC v. Midwest Indep. Transmission Sys. Operator, Inc., 137 FERC ¶ 61, 076, P 37 (2011)("E.ON”)).

On' appeal, Ameren principally contends that the Commission’s action is confiscatory insofar as it denies Ameren the ability to earn a return on network upgrades and fails.to compensate Ameren for business risk, Petrs Br. 30-35. Ameren maintains that the challenged orders fail to address its most important concern, namely, that absent gaining generator consent, the orders “force [Ameren],to construct, own, and operate transmission facilities without any return, ie.,. on a non-profit basis.” Id. at 37-38. The court vacates the challenged orders, concluding that “there is neither evidence nor economic logic supporting [the Commission’s] discrimination] theory as applied to transmission owners without affiliated generation assets,” and ‘that the Commission failed to respond adequately to Ameren’s ‘ non-profit objection. Op. at 573, 582-83. For the following reasons, I respectfully dissent.
I.
As a preliminary matter, it is worth acknowledging the limited scope of the court’s review of Commission orders. “[I]n a technical area like electricity rate design,” courts must “afford great deference to the Commission in its rate decisions.” FERC v. Elec. Power Supply Ass’n, — U.S. -—, 136 S.Ct 760, 782, 193 L.Ed.2d 661 (2016) (quoting Morgan Stanley Cap. Grp., Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cty., 554 U.S. 527, 532, 128 S. Ct. 2733, 171 L.Ed.2d 607 (2008)). As in other agency cases, courts do -not “ask whether a regulatory decision is the best one possible or even whether it is better than the alternatives,”' but instead ask whether “the agency has ‘examine[d] the relevant [considerations] and' articulate[d] a satisfactory explanation for its aetion[,] including a • rational connection between the facts found and the choice made.’ ’-’ Id. at 782 (quoting Motor Vehicle Mfrs. Ass’n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). Under the Federal Power Act, factual findings of the Commission that are supported by substantial evidence in the record are “conclusive.” 16 U.S.C. § 825l(b); see also Colo. Interstate Gas v. FERC, 599 F.3d 698, 704 (D.C. Cir. 2010). Furthermore, this court has recognized that it is “perfectly legitimate for the Commission to base its findings ... on basic economic theory,” as long as “it explain[s] and applie[s] the relevant' economic principles in a reasonable manner.” Sacramento Mun. Util Dist. v. FERC, 616 F.3d 520, 531 (D.C. Cir. 2010).
By way of background to understanding the Commission’s ongoing consideration of cost allocation in the Midwest region, the critical undisputed fact is that under the Midcontinent System Operator (“MISO”) Tariff, generators bear 90 to 100 percent of the costs of construction of network upgrades. The Commission determined in 2003 that when the generator funds the network-- upgrade, the generator is to receive credits against transmission service for the amounts, funded. Standardization of Generator Interconnection Agreements and Procedures, Order No. 2003, 104 FERC ¶ 61,103 P 28, 694 (2003) (“Order No. 2003”). The Commission, however, al *587 lowed regional transmission .organizations “flexibility as to the specifics of the interconnection pricing policy.” Id. P 28. Under MISO’s Tariff, transmission owners provided a credit for 50% of the costs borne by generators that funded network upgrades. Midwest Independent Transmission System Operator, Inc., 129 FERC ¶ 61,060, P 3 (2009) (“Midivest ITO 2009”). This changed in 2009. The Commission, acting in “recognition] that cost allocation is one of the most difficult and contentious issues facing the Midwest ISO regional at this time,” id. P 2, approved a proposal by MISO and its transmission owners (including Ameren) to amend MISO’s Tariff, id. P 48, “conditioned upon” the filing of a tariff with “a cost allocation methodology . . as [was] just and reasonable and not unduly discriminatory or preferential,” id. P 49. Under the superseding Tariff, MISO’s Option 2 “increasefd] the cost responsibility of a[] [generator] to 100 percent of the Network Upgrade costs, with a possible 10 percent reimbursement for projects that weré 345 kV and above.” Id. P 3.
II.
In the first of the challenged orders, the Commission, in again addressing the contentious issue of cost allocation in this section 206 proceeding, rejected the request of a transmission owner (“Otter Tail”) for unilateral discretion to choose the funding method for network upgrades. The Commission determined that such discretion could allow transmission owners to discriminate against generators through the imposition of increased costs, thereby “frustrat[ing] the development of new, competitive generation.” June 2015 Order PP 48-49. Examining Article 11.3 of MISO’s Generator Interconnection Agreement, the Commission reasoned that the provision appeared unjust and unreasonable and unduly discriminatory or preferential because “it allows the transmission owner the discretion to elect to initially fund the upgrades and subsequently assess the [generator] a network upgrade charge that is not later reimbursed ,.. through ... credits,” and it “may deprive the [generator] of other options to finance the cost of network upgrades that provide more favorable terms and rates.” Id. P 48.
As Joint Intervenors point out, MISO’s post-2009 credit policy is “[a] primary reason” the Commission determined that such unilateral discretion was unjust and unreasonable .and unduly discriminatory, Jt. In-tervenors’ Br. 11 (citing June 2015 Order P 3). Intervenors elaborate that by asking for a revised MISO-specifie credit policy in 2009 and abandoning responsibility for financing network upgrades, MISO transmission ■ owners “gave up the opportunity to earn a rate of return on the network upgrades.” Id. at 12; see August 2016 Order P 15. Now the generator “bears the full cost of the network upgrades,” save for at most 10%, and the transmission owner “has no asset to roll in its rate base to earn a rate of return.” Jt. Intervenors’ Br. 12; see August 2016 Order P 12. MISO’s credit policy .imposes significant costs.on generators: for example, a generator required to fund a $10 million network upgrade, would receive at most, $1 million in credits. Jt. Intervenors’ Br. 12. Consequently, the credit policy can “cost the [generator] tens of millions of dollars more than the basic Order No. 2003 construct.” Id. at 11-12. To this extent, then, by seeking a MISO-spe-cific tariff amendment, transmission owners’ inability to earn a return on generator funding is of their own doing. As Interve-nors note, Ameren could earn a return were MISO to revert back to the crediting scheme under Order No. 2003. Id. at 13.
On rehearing, the Commission rejected Ameren’s arguments that there was insufficient evidence of discrimination and that *588 the incremental risk of new generator-funded network upgrades would- force them to operate on a nonprofit basis.[2] The Commission reaffirmed its determination that transmission owners’ unilateral discretion over initial funding “would improperly impose costs on [generators].” December 2015 Order P 29. Because generators “bear between 90 to 100 percent of the costs for network upgrades in MISO,” the Commission explained, “it stands to reason that [generators] would have the incentive to find the lowest cost solution to funding” such upgrades. Id. at P 56. Conversely, transmission owners have an incentive to increase costs for the very reason Ameren has challenged the Commission’s orders: it seeks a return on top of the cost of the network upgrades. See Id. P 59; June 2015 Order P 48. Thus, as Intervenor American Wind Energy Association pointed out in comments of September 30, 2015 to the Commission, where the generator pays for the upgrade plus a return on 100% of the “capital invested by the transmission owner collected over time, such as a 20 or 30 year period[,]” “[s]imple math shows that self funding [by a transmission owner] is more costly to the [generator].” Ameren does not dispute the Commission’s key determination—that generators have an incentive to find lowest cost funding solutions, while transmission owners do not— and has provided no basis for the court to disturb the Commission’s findings and determinations.
The Commission reasonably responded to Ameren’s argument that removal of transmission owners’ unilateral discretion over initial funding improperly deprived it of the ability to recover prudently-incurred transmission costs of service from generators beyond the capital costs of the network upgrades. For instance, the Commission rejected the argument that the initial funding option under Article 11.3 of MISO’s pro forma tariff allows transmission owners to recover non-capital costs as contrary to its precedent in Midcontinent Independent System Operator, Inc., 145 FERC ¶ 61,111 at P 41 (2013) (“Hoope-stem”), in which it had determined that doing so would be “unduly discriminatory” because a generator “charged under Option 2 would only be required to pay for the -capital costs of network upgrades.” December 2015 Order P 57. The Commission pointed out that Ameren will recover its cost of service through its transmission rates, which will be charged to generators as they take service on the owner’s system. Id. P- 57 & n.118 (citing Ameren’s Attachment O rate formula template). Significantly as well, the Commission rejected the argument that its “proposed Tariff language would not allow transmission owners to ‘set’ a rate of return to directly assign compensation for business risk, such as lawsuits, reliability compliance obligations, environmental and construction risks, to a [generator], inasmuch as such business risk associated with owning transmission are even included in a .transmission owner’s return ... under the initial funding option.” Id. P 59. (emphasis added). And the Commission observed that “[t]o the extent MISO belieyes that the mutual agreement aspect of the [revised] initial funding option raises concerns about the impact of certain costs on particular transmission owners and their customers, MISO may file a proposal under section 205 of the FPA to address such concerns.” Id. P 57. In addition, the Commission noted that it was “simultaneously considering generic interconnection cost issues in a separate rulemaking proceeding *589 in Docket No. RM15-21,” emphasizing that now it was only finding MISO’s Tariff “unjust and unreasonable and unduly discriminatory based on the record before us here.” Id. P 60.
Balancing risks in allocating costs, the Commission determined that Option 2 was a just and reasonable rate and available under MISO’s Tariff, noting that Ameren “ignores the continued existence of the transmission owner’s initial funding option” by mutual agreement with the generator. December 2015 Order P 59. It emphasized that “the obligation to fund these network upgrades rests with the [generator] under MISO’s Tariff and as credits are not provided in return for this funding, we find that it is potentially unjust, unreasonable and unduly discriminatory to deprive the [generator] of the ability to provide its own capital funding.” Id. P 59. Citing FPC v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944), the Commission acknowledged that its “task is to allow a public utility the opportunity to offer its investors a return that is commensurate with the risk associated with their investment, as represented by the utility’s business and financial risks.” August 2016 Order P 13. It found that where generator funding is used, “the [generator] making the up-front investment bears the business and financial risks associated with financing and constructing the network upgrades.” Id. “Because the transmission owner does not bear that risk,” the Commission determined that “its investors are not exposed to that risk, and it is therefore not necessary for the transmission owner to offer investors a return based on that risk in exchange for their investment of capital.” Id.

The Commission observed further that Ameren “does not allege that funding for network upgrades under Option 2 is confiscatory inasmuch as it provides an insufficient rate of return to a transmission owners; rather, [Ameren] take[s] issue only with the fact that [it] will no longer unilaterally elect that financing option.” Id. P 15 (emphases added). Additionally, the Commission determined, Ameren “had not shown how requiring [a generator] to post security to address risk during construction and allowing [a generator], as opposed to the transmission owner, the initial opportunity to fund network upgrades, precludes transmission owners from operating successfully, maintaining financial integrity, attracting capital, and compensating investors for the risks assumed, in violation of Hope." Id. P 16. Were Ameren in fact to incur uncompensated costs, such proof could be presented in a future proceeding. See December 2015 Order P 57; see also id. P 60.
III.
The court nevertheless concludes that the challenged orders must be vacated. Op. at 585. The reasons offered by the court for vacatur are unpersuasive because the so-called “deficiencies,” id. at 584, simply ignore the Commission’s analysis and Am-eren’s failure to produce evidence of uncompensated risks as well as the Commission’s manner of proceeding, addressing capital costs here and generic interconnection cost issues in a separate docket. The challenged orders reflect the Commission’s determination upon assessing a complex and difficult balancing of risks in regard to recovery of costs, and the court owes deference to the Commission’s expertise and technical understanding. See Elec. Power Supply Ass’n, 136 S.Ct. at 784.
A.
The court faults the Commission for failing to show why a transmission owner without affiliates would discriminate among generators. Op. at 578-79. But *590 Ameren never argued this point to the Commission. See Request for Reh’g of the Certain MISO Transmission Owners (Jul. 20, 2015); Request for. Reh’g of the Indicated Transmission Owners (Jan. 28, 2016); Request for Reh’g of the Indicated Transmission Owners (Sept. 8, 2016). Nor did Ameren argue that the Commission’s determination regarding generator funding should be limited to transmission owners with affiliates (such as “Ameren Missouri”). See Op. at 578-79. Ameren dispúted only the Commission’s determination that undue discrimination' may occur if transmission owners could unilaterally elect to fund network upgrades. The court insists that Ameren’s incentive theory “can hardly be thought a new argument” given Ameren’s “vigor[ ]” in broadly claiming there was no evidence of discrimination. Op. at 578. But an implicit argument about incentives does not meet the statutoiy requirement and the court offers no pertinent record citation. This court’s jurisdiction is limited to grounds “‘set forth specifically5 in the petitioner’s request for Commission rehearing.” Ind. Util. Reg. Comm’n v. FERC, 668 F.3d 735, 739 (D.C. Cir. 2012) (quoting 16 U.S.C. § 825l(a)); see Kelley ex rel. Mich. Dep’t of Nat. Res. v. FERC, 96 F.3d 1482, 1487-88 (D.C. Cir. 1996). The court, therefore, vacates the orders' based in part on an argument that the Commission never had the chance to consider and over which the court, therefore, lacks jurisdiction. 16 U.S.C. § 825l (b).
That procedural default aside, the court could 'hardly dispute that Ameren has “a competitive motive” to favor affiliated generators over other generators. The Commission addressed this circumstance in Order No. 888 and the Supreme Court thereafter observed that “utilities’ control of transmission facilities gives them the power either to refuse to. deliver energy produced by competitors or to deliver competitors’ power on terms and conditions less favorable than those they apply to their own transmissions.” New York v. FERC, 535 U.S. 1, 8-9, 122 S.Ct. 1012, 152 L.Ed.2d 47 (2002); see Nat’l Ass’n of Reg. Utility v. FERC, 475 F.3d 1277, 1279 (D.C. Cir. 2007). The court recognized in a monopoly context that transmission owners “naturally wish to maximize profit” and “can be expected to act in their own interest .., even if they do so at the expense of lower-cost generation companies and consumers.” Transmission Access Policy Study Grp. v. FERC, 225 F.3d 667, 684 (D.C. Cir. 2000). The Commission has identified a similar motivation in its interconnection precedent in determining, in view of MISO’s post-2009 credit policy, that unilateral transmission owner control over initial funding of upgrades “creates unacceptable opportunities for ündue discrimination.” E.ON, 137 FERC ¶ 61,076, P 38. So too in the challenged orders. In short, even if the court had jurisdiction, its vacatur is overbroad.
This court has recognized that the Commission may properly take action “premised not on individualized findings of discrimination by transmission providers, but on a fundamental systemic problem.” Transmission Access Policy Study Grp., 225 F.3d at 684. Here, the Commission was confronted with the fundamental, systemic problem of the recovery of capital costs, see August 2015 Order P 17, where transmission owners had threatened to withdraw from a regional organization, see Midwest ITO 2009, P 7, and now sought to impose increased costs on generators without increasing service based on a unilateral discretionary choice of the method of funding network upgrades. June 2015 Order P 52. As discussed, the Commission identified the .contrasting economic motivations of transmission owners and generators, see, e.g., December 2015 Order PP 29, 56, *591 59; June 2015 Order P 48, in determining that the transmission owner funding option would involve imposition of a network upgrade charge, June.2015 P 48, and a more onerous security requirement, December 2015 Order P 29, and loss to generators of the opportunity to secure more favorable financing, id.

In addition to relying on “reasonable economic propositions,” see S.C. Pub. Serv. Auth. v. FERC, 762 F.3d 41, 65 (D.C. Cir. 2014), and its precedent, the Commission pointed to empirical evidence that transmission owners’ unilateral election to initially fund network upgrades could result in increased costs to generators or be implemented in an unduly discriminatory way. The Commission looked to the Border Winds protest where evidence was introduced that a transmission owner’s initial funding election increased the costs to the generator. December 2015 Order P 33. The court characterizes the study as “flawed,” Op. at 578 n.10, but this is an overstatement. The Commission itself recognized that the transmission owner’s proposed fixed rate was not calculated in conformity .with a clarification in Commission precedent but concluded “the case record in Border Winds” nonetheless showed increased generator costs, because Border Winds never indicated that a “lower fixed charge rate ... would still not represent an increase in cost compared to” generator funding. December 2015 Order P 33. Further, the Commission pointed out, its clarifying precedent had not considered the effect of a transmission owner’s unilateral election of initial funding on relative capital costs. See id. P 34.
Indeed, the court acknowledges that “it is certainly possible, if not probable” that generators could be deprived of less -costly financing options. Op. at 579;' see June 2015 Order P 49; Jt. Intervenors’ Br 13-14 (citing comments of Intervenor American Wind Energy Association). Yet the court dismisses without serious engagement, - see Op. at 579-80, the Commission’s extended consideration of the difficulties -presented by cost allocation in the Midwest region, see Midwest ITO 2009, P 2, aggravated by MISO’s post-2009 credit policy, as well as the Commission’s determination to adhere to the principles underlying Order No. 2003, so as to prevent undue discrimination, preserve reliability, increase energy supply, and lower wholesale prices for 'customers by increasing competition, and its interconnection precedent in Hoopeston and E.ON to ensure transmission owners could not unilaterally increase costs to generators.
B.
The court also raises the specter of additional uncompensated risks and concludes the Commission “inadequately considered” Ameren’s argument. Op, at 580. Were this so, then1 a remand for further explanation, not vacatur, would be appropriate. See Allied-Signal v. Nuclear Reg. Comm’n, 988 F.2d 146, 151 (D.C. Cir. 1993), But it is not so. The court concludes the Commission “makes no real attempt to holistically assess all of the various risks and benefits to the transmission owner caused by the addition of the upgrade facilities.” Op. at 16. That, at best, is an overstatement. The court’s analysis is doubly flawed.
First, the Commission’s response is understandable because Ameren offered only bare generalities about its uncompensated costs, but no specifics. December 2015 Order P 59. In seeking rehearing, Ameren referred broadly and baldly to concern about “lawsuits, reliability compliance obligations, environmental risk, and construction risk, among others.” Request for Reh’g of the Indicated Transmission Owners (Sept. 8, 2016), at 13. In a footnote, the *592 court labors unsuccessfully to recast Am-eren’s general claims as specific ones. See Op. at 580 n.14. Absent any evidence of specific uncompensated costs, however, what Ameren presented to the Commission was a claim for generic relief that was being addressed in a separate docket. December 2015 Order PP 40, 60. The court’s reliance, Op. at 583, on American Telephone & Telegraph Co. v. FCC, 978 F.2d 727, 729 (D.C. Cir. 1992), is misplaced. Here there was no “administrative shell game.” Id. at 731-32. The Commission stood ready to address Ameren’s business risk claims but was stymied from doing so in this adjudicatory proceeding because Ameren failed to present any specific evidence. In deciding to address generic claims in a separate proceeding, the Commission was “merely exercising its well-established discretion to ‘order [its] own docket[ ].’ ” Algonquin Gas Transmission. Co. v. FERC, 948 F.2d 1305, 1315 (D.C. Cir. 1991) (alterations in original); see U.S. Tel. Ass’n v. FCC, 359 F.3d 554, 588 (D.C. Cir. 2004).
Second, the court ignores that Ameren never points to any explanation it offered to the Commission of how it faced any additional insurance, construction, or environmental risk as a result of a particular funding method over another. It is undisputed that under MISO’s Tariff, as the Commission found, Ameren as a transmission owner is compensated for operational and management costs. December 2015 Order P 47 n.118 (citing MISO, FERC Electric Tariff, att. O). Transmission owners are 'also required to purchase Employers’ Liability and Workers’ Compensation Iiisurance, Commercial General ■ Liability Insurance, Comprehensive Automobile Liability Insurance, and Excess Public Liability Insurance regardless of how network upgrades are funded. MISO, FERC Electric Tariff, att. X, app. 6 (GIA) § 18.4 (minimum insurance requirements). Generators, in turn must post security, under MISO’s Tariff, “in order to address risk during construction.” December 2015 Order P 59. Ameren does not suggest the risk of an environmental violation is anything other than equal under either initial funding method. In the Commission’s words:
Indicated MISO Transmission Owners have not explained how allowing [a generator] to fund network upgrades under Option 2 fails to protect against unspecified ‘other risks associated with construction (not otherwise addressed by insurance)’ or operating risks due to requirements “to operate customer-financed assets in compliance with applicable Reliability Standards,” violations of which could “result in penalties that would not be recoverable from customers.”
August 2016 Order P 17 (quoting Request for Reh’g at 22).
Furthermore, the Commission determined that network upgrades could mitigate transmission owners’ reliability risk by reducing congestion. August 2016 Order P 17. In the post-Order No. 888 context, this court has recognized that network upgrades “provide system-wide benefits.” NARUC, 475 F.3d at 1285. The court characterizes the benefits of network upgrades as “a possibility to be explored,” Op. at 580, rather than a determination to which the court owes deference. This misses the mark. The Commission’s point was that in view of the acknowledged benefits of network upgrades, Ameren had not explained how network upgrades “should be considered additive to the reliability risk,” August 2016 Order P 17, much less shown that it faced additional reliability risk as would justify setting aside the challenged orders as confiscatory. The determination *593 that Ameren had not shown additional reliability risk deserves deference.
Having failed to identify any unrecoverable additional costs traceable to the challenged orders, Ameren attempts to shift its “heavy” burden on rehearing, see Hope, 320 U.S. at 602, 64 S.Ct. 281, by contending that the Commission- “ignores the fundamental reality that all new facilities bring incremental risk of operation.” Reply Br. 22. Of course, that simply elides the question of whether there are any risks that are uncompensated, for not every regulatory decision requiring action by a regulated entity gives rise to a corresponding entitlement to a return—“regulation does not insure that the business shall produce net- revenues.” Hope, 320 U.S. at 603, 64 S.Ct. 281 (internal quotation marks omitted). The court accepts that allowing generators to select the initial funding method “might remain bearable so long as the generator-funded upgrades growing inside the grid remain tiny relative to their host.” Op. at 581. And although the Commission acknowledges that independent power generators have an increasing presence since Order No. 888, Rspdt’s Br. 4, the Commission’s statutory concern is that “competition depend[s] on generators’ having adequate means of getting their power to market.” NARTJC, 475 F.3d at 1279 (internal citation omitted). Unbundling under Order No. 888 required equal access for generators to transmission facilities, see id., and in Order No. 2003, the Commission standardized procedures for generator interconnections. The challenged orders reflect adherence to those principles.
Under the circumstances, there is no basis for the court to state that the Commission made “no real attempt to holistically assess” risks and benefits, Op. at 580, given Ameren’s evidentiary failure, the Commission’s determination regarding reliability risk, and its broader analysis of the allocation issue based on the record before it. Instead, the court has ignored inconvenient record facts and the Commission’s fulsome response to Ameren’s arguments, including its explicit statement on the limits of its ruling on MISO’s Tariff in the challenged orders. December 2015 Order P 60. The Commission’s assessments of how the risks should be balanced in allocating capital costs is a quintessential task involving Commission expertise and technical understanding that is entitled to deference by the court. See Elec. Power Supply Ass’n, 136 S.Ct. at 784.
C.
The court also mistakenly accepts Amer-en’s bald assertion that the challenged orders will force transmission owners to operate on a nonprofit basis in violation of Hope. Op. at 581-83. In Hope, the Supreme Court addressed whether natural gas rates threatened a company’s overall financial integrity; it nowhere suggested that the Federal Power Act entitled a company to the ability to earn a favorable return on every portion of its business. See Hope, 320 U.S. at 605, 64 S.Ct. 281. Addressing a similar issue under a state statute, the 'Supreme Court made clear that the focus was on whether “[t]he overall impact of the rate orders” would “jeopardize the financial integrity of the companies.” Duquesne Light Co. v. Barasch, 488 U.S. 299, 310, 109 S.Ct. 609, 102 L.Ed.2d 646 (1989). The court here acknowledges that “[investors ... invest in entire enterprises, not just portions thereof.” Op. at 581. Why that is not also a permissible perspective for the Commission when weighing risks relating to the recovery of capital costs is not explained.[3]

*594 The issues now before the court are whether the Commission reasonably determined under the Federal Power Act, based on the- evidence presented, that it is (1) unduly discriminatory to allow transmission owners unilaterally to select a financing scheme that increases costs for a generator seeking interconnection services, and (2)- just and reasonable to allow a generator to choose to pay the upfront capital costs of network upgrades required for interconnection, with the result that those capital costs are excluded from, the transmission owner’s rate base. The court appears to assume that generator-funded upgrades will comprise a “significant fraction” of Ameren’s overall business. Op. at 584 n.18. But the court points to no Amer-en financial-data that would support: its prediction that the Commission’s decision unlawfully interferes with Ameren’s “business model.” Op. at 581. An affidavit it cites from the Otter Tail Power Company describing a number of upcoming interconnection projects, see Op. at 25 n.18, hardly suffices to carry Ameren’s “heavy” burden on rehearing to disturb- the Commission’s balancing of risks. See Hope, 320 U.S. at 602, 64 S.Ct. 281.
D.
The court’s discounting of the'Commission’s reference to Ameren’s opportunity to present evidence of uncompensated risks in a future proceeding, Op. at 582-83; December 2015 Order P 57, fares no better. The court states that “fines and penalties for violations-of mandatory reliability standards ■ and environmental regulations are generally charged directly to the utility, not passed through to customers via rate increases.” Op. at 582; see Pet’rs. Br. 33 n.l. The stipulated agreement in In re SCAN A- Corp., 118 FERC ¶ 61,028 .(2007); see Op. at 582, nowhere suggests fines and penalties are unrecoverable as a matter of law. Even assuming the general practice is that fines and penalties are not passed on, the court cites no authority the Commission erred as a matter of law in holding out the evidentiary opportunity for Amer-en. See Op. at 582.' The Commission’s rejection of Ameren’s arguments as to uncompensated business risks and forced “non-profit” operation rested on Ameren’s failure.to proffer specific evidence. See August 2016 Order PP 16-17. Given the Commission’s stated position in the challenged orders, there -is no basis for the court to conclude the outcome of a future hearing is a “foregone conclusion.” Op. at 583. The court’s vacatur thus overshoots its target and jumps the gun.
III.
' The Federal Power Act mandates the Commission ensure that rates are “just and reasonable” and not unduly discriminatory, 16 U.S.O. § 824d(a)-(b). A purpose of Order No. 2003 is to “increasefe] the number and variety of new generation thát will compete in the wholesale electricity market.” Order No. 2003 at P 1. Given the established economic motivations and the post-2009 MISO credit policy’s treatment of capital costs, the Commission reasonably and adequately explained its assessment of how risks should be balanced between investor and customer interests. See 
*595
Hope, 320 U.S. at 603, 64 S.Ct. 281. The Commission recognized the complex and contentious nature of the issue in the Midwest region, conditionally approved the 2009 proposal of MISO and. its transmission owners to amend MISO’s Tariff, and has now, based on the record before it, determined, in its expert judgment, that Ameren’s arguments for unilateral control of the method of funding network upgrades must be rejected and generators allowed to choose the funding method. The same two funding options for network upgrades-that were available prior to the challenged orders remain available; the only change is that the choice belongs to generators with an incentive to minimize costs rather than to transmission owners with an incentive to impose additional costs that could frustrate the development of new generation.
In doubting the adequacy of the Commission’s determination of the appropriate allocation of capital costs in MISO, the court asserts that the Commission failed to address the concern that “when portions of a business are unprofitable, it detracts from the attractiveness to investors of the business as a whole.” Op. at 581. But the Commission directly addressed that concern when it found that Ameren had failed to present evidence showing a threat to its overall financial integrity as would warrant finding the challenged orders were confiscatory. August Order 2016 P 16. Somehow the court overlooks that Ameren’s laser-like focus is on regaining unilateral control over funding network upgrades; See August 2016 Order P 15. Hope does not require this, for reasons the Commission explained. Commission precedent likewise points the other way. Absent evidence that the challenged orders will cause generator-funded network upgrades to occupy so “significant [a] fraction” .of . Ameren’s business as would jeopardize its overall financial integrity, the Commission’s .reasons for rejecting unilateral transmission owner control were’ not arbitrary or capricious. Vacating the challenged orders at this juncture is inconsistent with the record before the Commission, its findings and determinations in allocating capital costs, and the court’s deferential standard of review.

. Four orders denied rehearing; a fifth order addressed compliance. Midcontinent Independent System Operator, Inc., Order Denying Rehearing, Granting in Part and Denying in Part Complaint, and Instituting Section 206 Proceeding, 151 FERC ¶ 61,220 (June 18, 2015) ("June 2015 Order”); Otter Tail Power Company v. Midcontinent System Operator, Inc., Order Denying Rehearing and Granting Clarification, and Directing Compliance Filing, 153 FERC ¶ 61,352 (Dec. 29, 2015) ("December 2015 Order”); Otter Tail Power Company v. Midcontinent System Operator, Inc., Order Denying Rehearing, 156 FERC ¶ 61,-099 (Aug. 9, 2016) ("August 2016 Order”); Midcontinent System Operator, Inc., Order on Compliance, 156 FERC ¶ 61,098 (Aug. 9, 2016); Midcontinent Independent System Operator, Inc., Order Denying Rehearing, 157 61, 013 (Oct. 7, 2016).

. Request for Reh’g of the Certain MISO Transmission Owners (Jul. 20, 2015); Request for Reh’g of the Indicated Transmission Owners (Jan. 28, 2016); Request for Reh’g of the Indicated Transmission Owners (Sept. 8, 2016).

. The court’s chastisement of the Commission, based on its counsel's puiported re *594 sponse to a hypothetical; question during oral argument before the court, is misplaced. The court suggests that counsel "eross[ed] a rather significant conceptual line” by agreeing that transmission owners would not be entitled to a return on a billion-dollar network, upgrade. Op. at 581-82. But the transcript shows that Commission counsel stated that transmission owners could seek a "profit” in such a future case if there were an "evidentia-ry basis” that the upgrade poséd a “demonstrated specific risk.” Oral Arg. at 39:30-40:51.