# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued May 5, 2020                    Decided July 10, 2020

No. 19-1142

NATIONAL ASSOCIATION OF REGULATORY UTILITY
COMMISSIONERS,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

TRANSMISSION ACCESS POLICY STUDY GROUP, ET AL.,
INTERVENORS

---

Consolidated with 19-1147

---

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

---

*Jennifer M. Murphy* argued the cause for petitioner National Association of Regulatory Utility Commissioners. With her on the briefs was *James Bradford Ramsay.*

*Dennis Lane* argued the cause for petitioners American Public Power Association, et al. With him on the briefs was *M. Denyse Zosa.*

*Cynthia S. Bogorad* and *William S. Huang* were on the brief for intervenor Transmission Access Policy Study Group in support of petitioners. *Jeffrey M. Bayne* entered an appearance.

*Anand R. Viswanathan*, Attorney, Federal Energy Regulatory Commission, argued the cause for the respondent. With him on the brief were *James P. Danly*, General Counsel, *Robert H. Solomon*, Solicitor, and *Jared B. Fish*, Attorney.

*Kim Smaczniak*, *Charles Carter Hall, Michael Panfil*, and *John N. Moore* were on the joint brief for Industry intervenors in support of respondent. *Vickie Patton* entered an appearance.

*Heather Curlee*, *Jeffery S. Dennis*, and *Andrew O. Kaplan* were on the joint brief for intervenors Solar Energy Industries Association, et al. in support of respondent. *Todd Glass, Gary Greenstein*, and *Randall S. Rich* entered appearances.

*Xavier Becerra*, Attorney General, Office of the Attorney General for the State of California, *Robert W. Byrne*, Senior Assistant Attorney General, *Harrison Pollak*, Acting Senior Assistant Attorney General*, David A. Zonana*, Supervising Deputy Attorney General, *Dennis L. Beck Jr., Theodore McCombs*, and *M. Elaine Meckenstock*, Deputy Attorneys General, *Maura Healey*, Attorney General, Office of the Attorney General for the Commonwealth of Massachusetts, *Liam J. Paskvan* and *Megan M. Herzog*, Special Assistant Attorneys General, *Karl A. Racine*, Attorney General, Office of the Attorney General for the District of Columbia, *Dana Nessel*, Attorney General, Office of the Attorney General for the State of Michigan, and *Peter F. Neronha*, Attorney General, Office of the Attorney General for the State of Rhode Island, were on the brief for *amici curiae* Commonwealth of Massachusetts, et al. in support of respondent.

*Samuel T. Walsh* and *Jason Neal* were on the brief for *amici curiae* Sunrun, Inc., et al. in support of respondent.

Before: ROGERS, GARLAND and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

WILKINS, *Circuit Judge*: In this consolidated action, the Court must once again referee the Federal Power Act's jurisdictional line separating the Federal Energy Regulatory Commission's jurisdiction over the federal wholesale market and States' jurisdiction over facilities used in local distribution. This time, Petitioners argue FERC is off-sides in Order No. 841 by prohibiting States from barring electric storage resources on their distribution and retail systems from participating in federal markets. We find no foul here, so we deny the Petitions.

## I.

Under the Federal Power Act ("FPA" or "Act"), 16 U.S.C. § 791a *et seq.*, Congress gives the Federal Energy Regulatory Commission ("FERC" or "the Commission") exclusive authority over the regulation of "'the sale of electric energy at wholesale in interstate commerce,' including both wholesale electricity rates and any rule or practice 'affecting' such rates," *FERC v. Elec. Power Supply Ass'n* (*EPSA*), 136 S. Ct. 760, 766 (2016) (quoting 16 U.S.C. §§ 824(b), 824e(a)), along with "jurisdiction over all facilities for such transmission or sale of electric energy," 16 U.S.C. § 824(b)(1). Congress charged FERC with ensuring that "both wholesale rates and the panoply of rules and practices affecting them" are "just and reasonable." *EPSA*, 136 S. Ct. at 773 (citing 16 U.S.C. § 824d(a)) ("FERC has the authority – and, indeed, the duty – to ensure that rules or practices 'affecting' wholesale rates are just and

reasonable."). To achieve this goal, FERC often issues orders aimed at "break[ing] down regulatory and economic barriers that hinder a free market in wholesale electricity." *Id.* at 768 (quoting *Morgan Stanley Capital Grp. Inc. v. Pub. Util. Dist. No. 1*, 554 U.S. 527, 536 (2008)).

However, relevant to the Orders challenged here, Congress left states with jurisdiction "over facilities used in local distribution or only for the transmission of electric energy in intrastate commerce, or over facilities for the transmission of electric energy consumed wholly by the transmitter," 16 U.S.C. § 824(b)(1), "except as specifically provided in" the Act, *id*.

**II.**

The Orders challenged in this case concern FERC's efforts to remove existing barriers to the participation of electric storage resources ("ESRs") in the Regional Transmission Organization and Independent System Operator markets ("RTO/ISO markets"), independent, nonprofit companies that manage segments of the federal grid. *Hughes v. Talen Energy Mktg., LLC*, 136 S. Ct. 1288, 1292 (2016); *Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 5 (D.C. Cir. 2002). Each RTO/ISO market creates its own set of "participation models," which set forth the tariff provisions, technical requirements, and other rules for specific types of electric-energy-providing resources. Because many participation models were designed for traditional generation resources, e.g., power plants, newly developed resources may be limited in the way in which they can participate – that is, buy and sell electric energy – in these markets. These limitations or "barriers to participation" constrain competition, according to FERC, because novel resources technically capable of participating are precluded from doing so as they are forced to operate under participation models designed for different technologies. ESRs, such as

batteries, are especially affected by such participation barriers because ESRs have "unique physical and operational characteristics" distinct from traditional resources: ESRs can "both inject energy into the grid and receive energy from it." *Elec. Storage Participation in Mkts. Operated by Reg'l Transmission Org. & Indep. Sys. Operators*, Order No. 841, 162 FERC ¶ 61,127, ¶¶ 2, 7 (Feb. 15, 2018).

To illustrate, consider the pumped-hydro storage resource, which moves water between two reservoirs as a means of storing and generating electricity. *Id.* ¶ 7 n.12. Or, demonstrative of recent innovations, consider the end-user who installs rooftop solar panels connected to batteries, which enable the end-user to maintain power indefinitely even when the end-user is unable to receive power from local service stations, e.g., during a blackout. ESRs are quickly becoming industry disrupters because they obliterate a foundational notion underpinning our electrical systems – that electricity cannot be efficiently stored for later use. *See EPSA*, 136 S. Ct. at 768 (explaining, only a few years ago, that generation resources are forced to generate electricity to match demand in real time). As *amici* for FERC put it, "[t]he same technological and economic forces that allow us to carry battery-powered computers in our pockets" are now able to efficiently store energy "anywhere on the grid" and can wait to release the electricity when supply is scarce. Br. of Sunrun Inc. et al., as *amici curiae* in Supp. of Resp't, at 1.

To accommodate the technical and operational "unique[ness]" of ESRs, FERC issued Order No. 841,[1] requiring each market to establish a participation model that ensures ESRs' eligibility "to provide all capacity, energy, and

---

[1] Order No. 841 modifies 18 C.F.R. § 35.28 (2018).

ancillary services that [they are] technically capable of providing in the RTO/ISO markets." Order No. 841 ¶¶ 3, 4. FERC, seeking to clarify the set of resources for which the federal markets must create a participation model, and also seeking to ensure that the models will not be designed for any particular electric storage technology, defined an ESR as "a resource capable of receiving electric energy from the grid and storing it for later injection of electric energy back to the grid." *Id.* ¶ 29. In Order No. 841, FERC explained that this definition is intended to encapsulate "all types of electric storage technologies, regardless of their size, storage medium . . . , or whether the resource is located on the interstate grid or on a [local] distribution system." *Id.* ¶ 22. It is important to note that any resource located on the local distribution system or behind the meter[2] must use the distribution facilities over which the States[3] exercise control to reach the federally controlled markets.

To meet this definition, the ESR must be "both physically designed and configured to inject electric energy back onto the

---

[2] "Behind the meter" refers to a location on the customer's side of the point of delivery or retail level. *Transmission Access Policy Study Grp. v. FERC*, 225 F.3d 667, 725 n.14 (D.C. Cir. 2000), *aff'd sub nom. New York v. FERC*, 535 U.S. 1 (2002).

[3] "State" is a short-hand for all non-federal "relevant electric retail regulatory authorities," or RERRAs, as Order No. 841 refers to them. A RERRA is any "entity that establishes the retail electric prices and any retail competition policies for customers," *Wholesale Competition in Regions with Organized Elec. Mkts.*, Order 719, 125 FERC ¶ 61,071, ¶ 158(c) (Oct. 28, 2008), and thus the term captures the state-level public utility commissions down to locally owned electric utilities or electric cooperatives. *See* 16 U.S.C. § 824(b)(1) (using "State" and "State commission" interchangeably); Order No. 841, Comm'r McNamee Concurrence in Part and Dissent in Part ¶ 2 n.3.

[federal] grid and, as relevant, [be] contractually permitted to do so (e.g., per the interconnection agreement between an [ESR] that is interconnected on a distribution system or behind-the-meter with the distribution utility to which it is interconnected)." *Id.* ¶ 33. Finally, although an ESR is not required to participate in the federal markets, the Commission expressly rejected commenters' requests for a type of state opt-out in which States could "decide whether [ESRs] in their state that are located behind a retail meter or on the distribution system are permitted to participate in the RTO/ISO markets through the [ESR] participation model." *Id.* ¶ 35. FERC added, however, that "nothing in this Final Rule is intended to affect or implicate the responsibilities of distribution utilities to maintain the safety and the reliability of the distribution system or their use of [ESRs] on their systems." *Id.* ¶ 36. (For ease of reference, we shall refer to this subset of ESRs – those that must transmit their electric energy through state-regulated systems and facilities in order to reach the federal markets – as "local ESRs.")

In Order No. 841-A, FERC denied rehearing with respect to Order No. 841's lack of State opt-out for local ESRs. *Elec. Storage Participation in Mkts. Operated by Reg'l Transmission Orgs. & Indep. Sys. Operators*, Order No. 841-A, 167 FERC ¶ 61,154 (May 16, 2019). FERC explained that its authority to regulate the RTO/ISO markets gave it the "authority to determine which resources are eligible to participate in [those] markets." *Id.* ¶ 38. FERC emphasized, again, that Order No. 841 did "not specify[] any terms of sale at retail," *id.*, but a State may not "broadly prohibit[] all retail customers from participating in RTO/ISO markets," *id.* ¶ 41, since States cannot "intrude on the Commission's jurisdiction by prohibiting all consumers from selling into the wholesale market," *id.* Finally, FERC noted that "Order No. 841 does not modify [S]tates' authority to regulate the distribution system,

including the terms of access, provided that they do not aim directly at the RTO/ISO markets." *Id.* ¶ 48 (internal quotation marks, alterations, and emphasis omitted).

Two petitions for review followed. The Court consolidated No. 19-1142, filed by National Association of Regulatory Utility Commissioners ("NARUC"), and No. 19-1147, filed by American Public Power Association, National Rural Electric Cooperative Association, Edison Electric Institute, and American Municipal Power, Inc. (collectively, "Local Utility Petitioners"). Petitioners do not question FERC's authority to require ESR-specific participation models at the federal grid, nor do they disagree with FERC's "laudable goal of lowering barriers for entry for [ESRs'] participation in the wholesale markets." NARUC Opening Br. at 2; *see also* Local Utility Pet'rs' Opening Br. at 5 (indicating general support for Order No. 841). Instead, both NARUC and Local Utility Petitioners argue that FERC has exceeded its jurisdiction by barring States from "broadly prohibiting" local ESRs from participating in RTO/ISO markets. Order No. 841-A ¶ 41. Along the same lines as its exceeding-jurisdiction argument, NARUC argues that the lack of opt-out "impinge[s] on the States' authority," *EPSA*, 136 S. Ct. at 767, and "commandeer[s]" the state administrative processes. NARUC's Opening Br. 31. Lastly, Local Utility Petitioners argue that even if FERC did stay within the bounds of its statutory authority, the lack of an opt-out is otherwise arbitrary and capricious under 5 U.S.C. § 706(2)(A).

## III.

Before reaching the merits of the petitions, we must assure ourselves of subject-matter jurisdiction. *See, e.g.*, *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 934 F.3d 649, 660 (D.C.

9

Cir. 2019). We conclude that Petitioners have standing to bring these claims and the matters are ripe for review.

"To establish Article III standing, an injury must be 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)). Because these Petitioners bring these petitions on behalf of their members, they "must demonstrate [that their] members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization[s'] purpose[s], and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Sierra Club v. EPA*, 926 F.3d 844, 848 (D.C. Cir. 2019) (internal quotation marks omitted). Finally, "[a]t least one [petitioner] must have standing to seek each form of relief requested in the [petitions for review]." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017).

NARUC, an association representing the interests of state utility commissions charged with regulating the electric utilities in their respective jurisdictions, has standing to seek the requested relief. Its members, the state utility commissions, have a plausible claim that they have the authority to block local ESRs from entering the federal market and FERC's Orders expressly take away that authority. The state utility commissions therefore plead an injury to their "judicially cognizable interest in the preservation of [their] own sovereignty" at the hands of FERC. *Bowen v. Pub. Agencies Opposed to Soc. Sec. Entrapment*, 477 U.S. 41, 50 n.17 (1986) (internal quotation marks omitted); *accord Bond v. United States*, 564 U.S. 211, 221 (2011) ("The federal balance is, in part, an end in itself, to ensure that States function as political

entities in their own right."). *Cf. Del. Dep't of Nat. Res. & Envtl. Control v. FERC*, 558 F.3d 575, 578-79 (D.C. Cir. 2009) (finding no injury where the state suffered no injury to a "concrete substantive interest" under the statutory scheme). An order from this Court vacating the challenged Orders and remanding to FERC to comply with the Act's jurisdictional provisions would redress the claimed injury of allegedly improper intrusion upon the States' jurisdiction.

Additionally, Local Utility Petitioners have standing to seek vacatur of the relevant portions of the challenged Orders. As Commissioner McNamee recognized in his dissent to the Commission's denial of rehearing, and as FERC failed to contest at oral argument, Local Utility Petitioners' members, which include local electric utilities that own or operate local distribution systems, have decision-making roles with respect to the connections of behind-the-meter ESRs to local distribution systems. They bear the operational burdens of those ESRs delivering electricity to federal wholesale markets. FERC's "refusal to adopt a framework" that provides state and local decision-makers with greater flexibility over their facilities causes injury to Local Utility Petitioners' members, Local Utility Pet'rs' Br. at 37, and such injury would be redressed by an order from this Court vacating FERC's Orders.

Finally, these matters are ripe for judicial resolution. While there are no conflicting state laws presented to the Court at this time, the challenge here is akin to a facial challenge, and the Court is merely asked to decide whether the Orders, on their face, either violate the Act's jurisdictional division or constitute an arbitrary and capricious agency action. *See Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 442 (D.C. Cir. 2012) (facial challenges to regulations rest on the premise that "no set of circumstances exist under which the

regulations would be valid") (brackets omitted). Thus, the purely legal issues presented here are fit for review, and there is no reason the court cannot now address the challenges presented. *See Nat'l Park Hosp. Ass'n v. Dep't of the Interior*, 538 U.S. 803, 807-08 (2003).

## IV.

"Where we conclude that a challenged regulatory provision does not exceed [the statute's] limits and otherwise satisfies the requirements of the APA, we will uphold the provision and preserve the right of complainants to bring as-applied challenges against any alleged unlawful applications." *Duncan*, 681 F.3d at 442. As explained below, that is the case here.

## A.

*EPSA* instructs us to confront Petitioners' exceeding-jurisdiction challenge in three parts.[4] First, we ask whether the challenged practice at issue in the Orders – prohibition of State-imposed participation bans – "directly affect[s] wholesale rates." 136 S. Ct. at 773. Second, we look to whether the Commission has regulated state-regulated facilities,[5] *see id.*,

---

[4] "FERC's interpretations of the jurisdictional provisions of the Federal Power Act . . . enjoy *Chevron* deference." *NARUC v. FERC*, 475 F.3d 1277, 1279 (D.C. Cir. 2007). Here though, we need not rely on that deference since FERC's authority under the Act is unambiguous. *See EPSA*, 136 S. Ct. at 773 n.5.

[5] Section 824(b)(1) preserved States' jurisdiction in three categories: (1) within-state wholesale sales (i.e., sales for resale), (2) retail sales of electricity (i.e., sales directly to end users), and (3) facilities used in local distribution, electric generation, only for the transmission of electric energy in intrastate commerce, or for the transmission of electric energy consumed wholly by the transmitter. 16 U.S.C.

and, lastly, we ensure that our determinations do not "conflict with the Act's core purposes" of "curb[ing] prices and enhanc[ing] reliability in the wholesale electricity market." *Id.*

We swiftly conclude that FERC's prohibition of state-imposed participation bans directly affects wholesale rates. FERC bears the responsibility of regulating the wholesale market, which encompasses "both wholesale rates and the panoply of rules and practices affecting them." *EPSA*, 136 S.

---

§ 824(b)(1). *EPSA* involved the States' authority with respect to the second category, but here, Petitioners seek to vindicate their authority with respect to the third category.

State authority over that third category is limited when the Act "specifically provide[s]" otherwise, 16 U.S.C. § 824(b)(1)—a limitation that did not apply to the retail sales at issue in *EPSA*. *See Transmission Access*, 225 F.3d at 696 (noting the FPA's multiple grants of jurisdictional authority). FERC does not rely on that limitation here. Instead, it seemingly agrees with Petitioners that the relevant question is whether its order "directly regulates local distribution facilities," but argues that it has not done so. FERC Br. 36. We accept that premise arguendo because we agree that FERC has not regulated local distribution facilities. But we note that this court has held that FERC may regulate electric generating facilities so long as it is addressing a practice affecting wholesale rates. *See La. Pub. Serv. Comm'n v. FERC*, 522 F.3d 378, 390 (D.C. Cir. 2008). And we further note that states have jurisdiction over electric-generating facilities subject to the same excepting clause that applies to the local distribution facilities at issue here.

However, as just said, Petitioners would fall short even if the FPA had barred FERC from ever regulating local distribution facilities. Thus, for purposes of this opinion, we treat "retail sales," "local distribution systems," and "behind the meter" interchangeably as all referring to matters over which States have jurisdiction and proceed on the assumption, arguendo, that FERC may not regulate local distribution facilities.

Ct. at 773. Order No. 841 solely targets the manner in which an ESR may participate in wholesale markets. This action is intentionally designed to increase wholesale competition, thereby reducing wholesale rates. Keeping the gates open to all types of ESRs – regardless of their interconnection points in the electric energy systems – ensures that technological advances in energy storage are fully realized in the marketplace, and efficient energy storage leads to greater competition, thereby reducing wholesale rates. Even NARUC acknowledges that local ESR participation in federal wholesale markets could have benefits. If "directly affecting" wholesale rates were a target, this program hits the bullseye.

Petitioners focus their energy on the second test: whether Order No. 841 unlawfully regulates matters left to the States. *See EPSA*, 136 S. Ct. at 775. Petitioners argue that by prohibiting States from blocking the gates to the federal markets, FERC is directly regulating access to those gates, a matter left to the States by statute. *See* 16 U.S.C. § 824(b)(1). But FERC is not regulating matters of access. There is little doubt that favorable participation models will lure local ESRs to the federal marketplace, which will require use of States' distribution systems, but that is the type of permissible effect of direct regulation of federal wholesale sales that the FPA allows. *See EPSA*, 136 S. Ct. at 776 (effects on retail rates of actions respecting wholesale transactions are "of no legal consequence"). Nothing in Order No. 841 directly regulates those distribution systems. *Accord NARUC v. FERC*, 475 F.3d 1277, 1281 (D.C. Cir. 2007) ("[A]ssertion of jurisdiction over specified transactions, even though affecting the conduct of the owner(s) with respect to its facilities, is not per se an exercise of jurisdiction over the facility."). States remain equipped with every tool they possessed prior to Order No. 841 to manage their facilities and systems.

Petitioners argue that one tool is missing: the ability to close their facilities to local ESRs seeking to transport electric energy to the wholesale markets.  After all, States have the authority to manage and oversee their distribution systems.  But because FERC has the exclusive authority to determine who may participate in the wholesale markets, the Supremacy Clause – not Order No. 841 – requires that States not interfere. *See Miss. Power & Light Co. v. Miss. ex rel. Moore*, 487 U.S. 354, 374 (1988).  The Supremacy Clause renders federal law the "supreme Law of the Land," U.S. CONST. art. VI, and Congress may "pre-empt, *i.e.*, invalidate, a state law through federal legislation," *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376 (2015).  In field preemption, "Congress may have intended 'to foreclose any state regulation in the *area*,' irrespective of whether state law is consistent or inconsistent with 'federal standards.'"  *Id.* at 377 (quoting *Arizona v. United States*, 567 U.S. 387, 401 (2012)).  "In such situations, Congress has forbidden the State to take action in the *field* that the federal statute pre-empts." *Id.*  Here, FERC's statement in Order No. 841-A that States may not block RTO/ISO market participation "through conditions on the receipt of retail service," Order No. 841-A ¶ 41, or impose any "condition[] aimed *directly* at the RTO/ISO markets, even if contained in the terms of retail service," *id.*, is simply a restatement of the well-established principles of federal preemption.  *See Oneok, Inc.*, 575 U.S. at 386 (explaining that preemption depends on "the *target* at which the state law *aims* in determining whether that law is pre-empted").

While the FPA creates two separate zones of jurisdiction, the Supremacy Clause creates uneven playing fields.  *N. Nat. Gas Co. v. State Corp. Comm'n of Kan.*, 372 U.S. 84, 93 (1963) ("Not the federal but the state regulation must be subordinated, when Congress has so plainly occupied the regulatory field."); *see Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kan.*,

489 U.S. 493, 515-16 (1989) ("State regulation . . . may be pre-empted as conflicting within FERC's authority over interstate transportation and rates . . . if a state regulation's impact on matters within federal control is not an incident of efforts to achieve a proper state purpose.").  Hence, NARUC's argument that a local ESR does not participate in the federal wholesale market (and thus cannot fall with FERC's authority) until after it navigates through State-regulated facilities fails. Any State effort that aims directly at destroying FERC's jurisdiction by "necessarily deal[ing] with matters which directly affect the ability of the [Commission] to regulate comprehensively and effectively" over that which it has exclusive jurisdiction "invalidly invade[s] the federal agency's exclusive domain." *N. Nat. Gas Co.*, 372 U.S. at 91-92.  While the Act's preemptive scope should be construed "narrowly in light of Congress' intent – manifested in [§ 201](b) of the Act – to preserve for the State the authority to regulate [non-federal jurisdictions]," *Oneok, Inc.*, 575 U.S. at 383-84, "[n]evertheless, [ ]pre-emption . . . *is* to be applied," *Nw. Cent. Pipeline Corp.*, 489 U.S. at 515 n.12.

Thus, Order No. 841 does not "usurp[] state power,"[6] *EPSA*, 136 S. Ct. at 777, nor does it impose a new "reasonably related" test that re-draws the jurisdictional divide between FERC and the States.  Local Utility Pet'rs' Opening Br. at 31.

---

[6] NARUC's commandeering argument fails for the same reasons.  As explained, FERC is not requiring States to guarantee access to States' distribution facilities in order to reach wholesale markets, so it is not "command[ing]" States "to administer or enforce a federal regulatory program." *See Murphy v. National Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 14777 (2018); *id.* at 1475 ("The anticommandeering doctrine . . . is simply the expression of a fundamental structural decision incorporated into the Constitution, *i.e.,* the decision to withhold from Congress the power to issue orders directly to the States.").

States continue to operate and manage their facilities with the same authority they possessed prior to Order No. 841. *See EPSA*, 136 S. Ct. at 777 (noting no interference with state authority because "States continue to make or approve all retail rates, and in doing so may insulate them from price fluctuations in the wholesale market"); *Conn. Dep't of Pub. Util. Control v. FERC*, 569 F.3d 477, 481-82 (D.C. Cir. 2009) (where economic impact of FERC regulation would likely force States to construct new generation facilities, such state response was not a "direct regulation" but the product of a state's response to changed incentives). States retain their authority to prohibit local ESRs from participating in the interstate and intrastate markets simultaneously, meaning States can force local ESRs to choose which market they wish to participate in. States retain their authority to impose safety and reliability requirements without interference from FERC, and ESRs must still obtain all requisite permits, agreements, and other documentation necessary to participate in federal wholesale markets, all of which may lawfully hinder FERC's goal of making the federal markets more friendly to local ESRs. Any such hinderance is of no concern because FERC's "vision of reasonableness and justice," *EPSA*, 136 S. Ct. at 774, cannot override the statutory limitations of FERC's jurisdiction, "no matter how direct, or dramatic, [that limitation's] impact on wholesale rates," *id.* at 775. Supreme Court "cases have consistently recognized a significant distinction, which bears directly upon the constitutional consequences, between" a State's regulations "aimed directly" at matters in FERC's jurisdiction, "and those aimed at" fulfilling a State's own jurisdictional obligations. *N. Nat. Gas Co.*, 372 U.S. at 94. "The former cannot be sustained when they threaten . . . the achievement of the comprehensive scheme of federal regulation." *Id.*

But the Court need not fret about hypothetical state regulations now – nor need it resolve every hypothetical presented in Petitioners' briefs. A facial challenge prevails where "no set of circumstances exists under which the [Orders] would be valid." *Duncan*, 681 F.3d at 442. Petitioners fail to meet this standard, but States will be free to challenge the Orders as applied to their own state regulations or imposed conditions. *Id.* Petitioners are likely correct that litigation will follow as States try to navigate this line, but such is the nature of facial challenges.

Lastly, because we do not conclude that FERC has perpetuated federal policy goals to the detriment of the statutory authority granted to the States, our determination is consistent with the FPA's purpose of maintaining the respective zones of jurisdiction while ensuring that FERC can carry out its duty of ensuring just and reasonable federal wholesale rates. *EPSA*, 136 S. Ct. at 781.

Because the challenged Orders do nothing more than regulate matters concerning federal transactions – and reiterate ordinary principles of federal preemption – they do not facially exceed FERC's jurisdiction under the Act. Our decision today does not foreclose judicial review should conflict arise between a particular state law or policy and FERC's authority to regulate the participation of ESRs in the federal markets.

**B.**

The Court must set aside the Orders if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Local Utility Petitioners – joined by Transmission Access Study Group, Intervenor on behalf of Petitioners, ("Transmission Access") – argue that even if FERC has the authority to prevent States

from broadly prohibiting local ESR participation in federal markets, its decision to exercise that authority in Order No. 841 was arbitrary and capricious. We disagree, concluding that FERC's decision to reject a state opt-out was adequately explained.

"[T]he court must uphold a rule if the agency has examined the relevant considerations and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *EPSA*, 136 S. Ct. at 782 (internal quotation marks and brackets omitted). This narrow scope of review does not question whether the administrative action was the best regulatory decision possible, "or even whether it is better than the alternatives," because it is not the role of a court to substitute its own judgment for that of the agency. *Id.*

Local Utility Petitioners rely heavily on the existence of a State opt-out in the programs reviewed in *EPSA*. There, the FERC orders at issue allowed States to "decide the eligibility of retail customers" in demand response programs. *Wholesale Competition in Regions with Organized Electric Markets*, Order No. 719-A ¶ 50, 128 FERC ¶ 61,059, FERC Stats. & Regs. ¶ 31,292, *on reh'g*, Order No. 719-B, 129 FERC ¶ 61,252 (2009); *EPSA*, 136 S. Ct. at 772 (explaining that the order challenged there "continue[d] Order No. 719's policy of allowing any state regulatory body to prohibit customers in its retail market from taking part in wholesale demand response programs"). In a nutshell, the demand response program enabled wholesale markets to compensate consumers for not using electric power at peak times, as a means of reducing pressure on the grid and lowering wholesale rates. *See EPSA*, 136 S. Ct. at 769-71; 18 C.F.R. § 35.28(b)(4) (defining "demand response" as "a reduction in the consumption of electric energy by customers from their expected consumption

in response to an increase in the price of electric energy or to incentive payments designed to induce lower consumption of electric energy"). The Supreme Court described the opt-out feature as "cooperative federalism," *EPSA*, 136 S. Ct. at 780, evidencing FERC's "recognition of the linkage between wholesale and retail markets and the States' role in overseeing retail sales," *id.* at 779. That said, Local Utility Petitioners correctly acknowledge that *EPSA* did not condition its holdings on the existence of an opt-out. Even if *EPSA* serves as an endorsement of different programs in the future, not even the Supreme Court can "substitute [its] own judgment for that of the Commission." 136 S. Ct. at 782.

More importantly, FERC's departure from such a policy in Order No. 841 is neither unexplained nor unsupported. The Commission was acutely aware of its opt-out in Order No. 719. *See* Order No. 841-A ¶¶ 51-52 (distinguishing ESR participation in wholesale sales from demand response resources participating in wholesale bids). The Commission specifically considered the benefits of enabling broad ESR participation to promoting just and reasonable wholesale rates. Order No. 841 ¶¶ 2, 19, 29. For example, the Commission explained that promoting more participation of ESRs in wholesale markets increases competition, likely causing prices to lower, and more diversity in the types of ESRs encourages participation models that will be untethered to specific storage technologies. *Id.* Along the same lines, a federal market unfriendly to certain sizes, capacities, and system operations inhibits future developers from designing such ESRs. *Id.* ¶ 12. Importantly, Local Utility Petitioners do not question those benefits.

Local Utility Petitioners and Transmission Access also take issue with FERC's failure to address States' existing policies dealing with ESRs and the increased need for State

oversight since ESRs raise additional concerns about a distribution system's safety and reliability with energy flowing in two directions. But FERC did address concerns that States may bear additional administrative burdens, and it also noted that States would remain unimpeded in their ability to manage their utilities, "allocat[ing] any costs that they incur in operating and maintaining their respective power systems." Order No. 841-A ¶ 45; *see* Order No. 841 ¶ 36; *see also* Order No. 841-A ¶ 42. FERC simply decided that such negative effects were outweighed by the benefits of the program. Order No. 841-A ¶ 45. Local Utility Petitioners may disagree with that calculus, but FERC's decision is not arbitrary and capricious. "This is the kind of reasonable agency prediction about the future impact of its own regulatory policies to which we ordinarily defer." *La. Energy & Power Auth. v. FERC*, 141 F.3d 364, 370 (D.C. Cir. 1998).

## V.

For the reasons stated above, Petitioners fail to show that Order Nos. 841 and 841-A run afoul of the Federal Power Act's jurisdictional bifurcation or that they are otherwise arbitrary and capricious. We therefore deny the petitions in Nos. 19-1142 and 19-1147.

*So ordered.*