# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

⸻

Argued February 6, 2024   Decided October 4, 2024

No. 23-1094

NEXTERA ENERGY RESOURCES, LLC AND NEXTERA ENERGY
SEABROOK, LLC,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

AVANGRID, INC. AND NECEC TRANSMISSION LLC,
INTERVENORS

⸻

Consolidated with No. 23-1215

⸻

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

⸻

*John N. Estes III* argued the cause for petitioners. With him on the briefs were *Matthew E. Price, Arjun Ramamurti*, and *Anand Viswanathan.*

*Robert M. Kennedy*, Senior Attorney, Federal Energy Regulatory Commission, argued the cause for respondent.

With him on the brief were *Matthew R. Christiansen*, General Counsel, and *Robert H. Solomon*, Solicitor.

*Eric J. Konopka* argued the cause for intervenors NECEC Transmission LLC and Avangrid, Inc. in support of respondent. With him on the brief were *Richard P. Bress*, *David L. Schwartz*, and *James B. Blackburn IV*.

Before: MILLETT, KATSAS, and RAO, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* KATSAS.

Dissenting opinion filed by *Circuit Judge* RAO.

KATSAS*, Circuit Judge*: The Federal Energy Regulatory Commission may regulate the transmission, but not the generation, of electricity. In this case, FERC required a generator to upgrade its circuit breaker so that another power source could safely connect to the regional transmission grid. The Commission ordered the new power source to compensate the generator for the direct costs of the upgrade, but not for its indirect costs. We hold that the agency had statutory authority to require the upgrade, correctly interpreted the governing tariff and contract to require the upgrade, and permissibly denied compensation for its indirect costs.

I

A

Supplying electricity to consumers requires three principal kinds of facilities—generators produce the electricity, transmission facilities move it over long distances, and distribution facilities move it over short distances to individual customers. *Detroit Edison Co. v. FERC*, 334 F.3d 48, 49 (D.C. Cir. 2003). The transmission market has high barriers to entry,

so transmission owners typically "enjoy a natural monopoly." *Transmission Access Pol'y Study Grp. v. FERC*, 225 F.3d 667, 683 (D.C. Cir. 2000) (*Transmission Access*).

The Federal Power Act allows FERC to regulate some, but not all, types of these facilities. Section 201(b) empowers the Commission to regulate the "transmission" and wholesale "sale" of electricity in interstate commerce, as well as "facilities" for such transmission or sale. 16 U.S.C. § 824(b)(1). But it also states that the agency, except as specifically provided, does not have jurisdiction over facilities used for the "generation," intrastate transmission, or local distribution of electricity. *Id.*

The modern structure of the electricity market reflects decades of changing technology and regulations. "In the bad old days," power grids were run by "vertically integrated monopolies" that owned generation, transmission, and distribution facilities. *Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1363 (D.C. Cir. 2004). Utilities sold these services in bundled packages to customers in limited geographic areas. *Pub. Util. Dist. No. 1 v. FERC*, 272 F.3d 607, 610 (D.C. Cir. 2001). Eventually, technological advances made it easier to generate electricity and transmit it over long distances. *See Transmission Access*, 225 F.3d at 681. But transmission owners exploited their monopoly power to deny competing sellers access to their facilities. *See id.* at 682–84. This practice resulted in artificially high electricity prices for consumers. *Id.* at 682.

In 1996, FERC responded with a regulation known as Order No. 888, which required transmission owners to give other generators equal access to interstate transmission facilities. *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public*

*Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, 61 Fed. Reg. 21,540 (May 10, 1996). Among other things, the Commission required transmission owners to "file open access nondiscriminatory tariffs" for wholesale transmission service, thus effectively "unbundling" sale of the power itself from sale of the transmission service. *See Detroit Edison*, 334 F.3d at 50. In *Transmission Access*, this Court upheld Order No. 888 "in nearly all respects." 225 F.3d at 681.

Implementation of Order No. 888 proved challenging. "[E]very time a new generator of electricity asked to use a transmission network owned by another—to interconnect the two entities—disputes between the generator and the owner of the transmission grid would arise," thus consistently delaying market entry by new generators. *ESI Energy, LLC v. FERC*, 892 F.3d 321, 324 (D.C. Cir. 2018). FERC responded with Order No. 2003, *Standardization of Generator Interconnection Agreements and Procedures*, 68 Fed. Reg. 49,846 (Aug. 19, 2003), which "require[d] all transmission facilities to adopt a standard agreement for interconnecting with generators larger than 20 megawatts." *Nat'l Ass'n of Regul. Util. Comm'rs v. FERC*, 475 F.3d 1277, 1279 (D.C. Cir. 2007) (*Utility Commissioners*). These agreements are known as Large Generator Interconnection Agreements (LGIAs). Order No. 2003 prescribed a standard LGIA. *See Pac. Gas & Elec. Co. v. FERC*, 533 F.3d 820, 823 (D.C. Cir. 2008). In *Utility Commissioners*, this Court upheld Order No. 2003—including its imposition of the standard LGIA—against various facial challenges under section 201(b). *See* 475 F.3d at 1279–80.

One final feature of the grid bears mention. To facilitate coordination among different transmission owners, FERC has encouraged them to establish Independent System Operators, which operate transmission facilities on behalf of the individual

owners. *See Morgan Stanley Cap. Grp. v. Pub. Util. Dist. No. 1*, 554 U.S. 527, 536–37 (2008). In the six New England states, ISO New England operates the regional power grid. As required by section 205(c) of the Federal Power Act, 16 U.S.C. § 824d(c), it has filed a systemwide tariff setting rates and other terms of service. *See Constellation Mystic Power, LLC v. FERC*, 45 F.4th 1028, 1036 (D.C. Cir. 2022).

B

This case involves a dispute between NextEra Energy Resources, LLC, which transmits electricity through the New England grid, and Avangrid, Inc., which wishes to do so. It turns on various provisions in the governing tariff and LGIA.

NextEra owns Seabrook Station, a nuclear power-plant located in Seabrook, New Hampshire. Electricity flows from the plant through a circuit breaker, which serves to interrupt fault currents—abnormally high currents caused, for example, by short circuits. When a fault occurs, the circuit breaker temporarily cuts Seabrook off from the grid. The breaker thus protects both Seabrook Station, which could be damaged by a high-voltage backflow of electricity, as well as the broader grid itself. As the amount of power flowing though the grid increases, so does the necessary capacity of the breaker.

As required by Order No. 2003, NextEra and ISO New England have entered into a Large Generator Interconnection Agreement governing the terms of Seabrook's connection to the regional transmission grid. Article 9.7.5 of the LGIA requires Seabrook to "install" and "maintain" circuit breakers in accordance with "Good Utility Practice." J.A. 326. The LGIA defines "Good Utility Practice" to include practices that could reasonably be expected to safely and reliably accomplish a desired result at reasonable cost. *Id.* at 283.

In 2017, Massachusetts engaged Avangrid to develop its New England Clean Energy Connect (NECEC) project. The project will supply Massachusetts utilities with power generated by hydroelectric facilities in Quebec. As part of the project, Avangrid and NECEC Transmission LLC have built a transmission line running from the Canadian border to Lewiston, Maine, where the power will enter the regional grid.

The ISO New England tariff sets forth rules governing the connection of new power sources to the grid. For proposed elective projects such as NECEC, the tariff requires ISO New England to conduct a study before the connection may take place. If the study reveals that interconnection would have a "significant adverse effect" on the reliability of other transmission owners' or customers' facilities, the project "shall not proceed" unless its sponsor "takes such action or constructs at its expense such facilities as the ISO determines to be reasonably necessary to avoid such adverse effect." J.A. 724.

Avangrid sought to connect the NECEC power line to the regional grid. After performing the requisite study, ISO New England determined that, with that connection, Seabrook could not safely remain connected to the grid unless it upgraded its circuit breaker. The breaker is currently operating at 99.6% of its capacity. If further power flowed from the NECEC line, the breaker would operate at 101.2% of its capacity. In other words, the size of a potential fault current could overwhelm the breaker and cause it to fail.

Seabrook and Avangrid disputed whether or how the circuit breaker should be upgraded. The parties agreed on several points: Avangrid cannot connect to the grid unless and until Seabrook upgrades the breaker; Avangrid must pay the direct costs of any upgrade; and any upgrade should take place while the plant refuels during a planned outage. But Seabrook

and Avangrid disagreed on whether the upgrade would require extending the plant's outage time. They disagreed on whether Avangrid must compensate Seabrook for indirect costs such as its legal costs and any lost profits on energy sales. Most significantly, they disagreed on whether Seabrook must upgrade the breaker even if Avangrid does not provide the degree of compensation that Seabrook has demanded.

C

Both parties asked FERC to resolve the dispute. Seabrook petitioned for a declaration that it was not required to upgrade the circuit breaker or, alternatively, that it was entitled to a full recovery of its direct and indirect costs. Soon after, Avangrid filed an administrative complaint seeking to prevent Seabrook from blocking the interconnection.

FERC ruled primarily for Avangrid. *NextEra Energy Seabrook, LLC*, 182 FERC ¶ 61,044 (2023). It concluded that because the circuit breaker was part of the Seabrook generation facility, tariff provisions requiring transmission network upgrades did not apply. *Id.* PP 75–76. But the Commission ruled that Good Utility Practice, as required by the LGIA, compelled Seabrook to upgrade the breaker. *Id.* PP 79–88. Finally, FERC concluded that Avangrid was not required to reimburse Seabrook for indirect costs of the upgrade such as any lost profits or legal expenses. *Id.* PP 100–06.

On rehearing, Seabrook argued that because the circuit breaker was part of its generation system and not part of the interstate transmission system, FERC lacked statutory authority to require the upgrade. The Commission rejected that contention based on this Court's decision in *Utility Commissioners*. *NextEra Energy Seabrook, LLC*, 183 FERC ¶ 61,196, PP 17–19 & n.39 (2023). The agency also reaffirmed

its rulings regarding the terms of the LGIA, *id.* PP 20–26, and the extent of required compensation, *id.* PP 36–46.

Seabrook has petitioned for review of these orders. We have jurisdiction under 16 U.S.C. § 825*l*(b).

II

We review FERC orders under the Administrative Procedure Act, which requires us to consider whether agency decisions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This standard of review is deferential to the agency; we must uphold decisions that are "reasonable and reasonably explained." *See FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021).

In the past, we have deferred to FERC's reasonable interpretation of ambiguous tariffs and contracts within its jurisdiction. *See Wabash Valley Power Ass'n v. FERC*, 45 F.4th 115, 119 (D.C. Cir. 2022); *Long Island Power Auth. v. FERC*, 27 F.4th 705, 716 (D.C. Cir. 2022). We have described these deference principles as "*Chevron*-like" in nature. *PSEG Energy Resources & Trade LLC v. FERC*, 665 F.3d 203, 208 (D.C. Cir. 2011); *see Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 843–44 (1984). This raises a question whether the principles survive the overruling of *Chevron* in *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024). But we need not consider deference here because FERC's interpretation of the disputed provisions of the LGIA and the tariff are in fact correct. *See FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 277 n.5 (2016).

9

A

The Federal Power Act states that FERC generally "shall not have jurisdiction" over "facilities used for the generation of electric energy." 16 U.S.C. § 824(b)(1). In its initial order, FERC concluded that the "location and purpose" of the Seabrook circuit breaker, which serves to protect the plant from fault currents, "indicate that the breaker is a generator component" not subject to the network upgrades required for transmission facilities. *NextEra Energy Seabrook*, 182 FERC ¶ 61,044, P 76. Based on that ruling, Seabrook argues that FERC lacks statutory authority to require replacement of the circuit breaker. On rehearing, FERC asserted the power "to enforce Seabrook's obligations with respect to its own facilities under the Seabrook LGIA." *NextEra Energy Seabrook*, 183 FERC ¶ 61,196, P 19. Under binding precedents, FERC had this authority.

To police the jurisdictional lines drawn by section 201(b), we ask three questions: first, whether the action at issue directly affects facilities or transactions that FERC may regulate; second, whether FERC has impermissibly regulated matters outside its jurisdiction; and third, whether the contested assertion of authority is consistent with the statute's core purposes. *See*, *e.g.*, *Elec. Power Supply Ass'n*, 577 U.S. at 276–77; *Nat'l Ass'n of Regul. Util. Comm'rs v. FERC*, 964 F.3d 1177, 1185–86 (D.C. Cir. 2020).

All three considerations support FERC's authority here. First, the upgrade directly affects the transmission of electricity in interstate commerce, an area where FERC may regulate. As explained above, Seabrook's barely-good-enough circuit breaker currently prevents other power sources from connecting to the interstate grid without posing substantial risks to Seabrook. If FERC could not order an upgrade in those

circumstances, incumbent generators could unilaterally prevent competing sellers from joining the grid, which would directly—and substantially—limit how much electricity could be transmitted. And if FERC could not require generators to install circuit breakers *at all*, the entire grid would be left vulnerable to widespread outages from fault currents.

Second, FERC has not impermissibly regulated Seabrook as a generator. Section 201(b) prohibits FERC from regulating generators "except as specifically provided," yet it permits FERC to regulate the interstate "transmission" of electricity. 16 U.S.C. § 824(b). Construing these provisions, we held in *Transmission Access* that "FERC may exercise jurisdiction over generation facilities to the extent necessary to regulate interstate transmission." 225 F.3d at 718. Likewise, in *Utility Commissioners*, we explained that FERC may require an interconnected generator to make "physical changes" to its own facilities if the changes "bear a close enough relation to FERC's exercise of jurisdiction over jurisdictional transactions." 475 F.3d at 1282.

Seabrook objects that its circuit breaker serves to protect its own generator—not interstate transmission facilities. But at the point of interconnection, the safety and reliability of generators and transmission facilities are closely related. And we have already held that FERC, in imposing the standard LGIA, permissibly "exercised its jurisdiction over the *terms* of" relationships between generators and transmission owners "with respect to electricity flowing" between the two kinds of facilities at the point of interconnection. *See Utility Commissioners*, 475 F.3d at 1280. In the order under review, FERC merely enforced a provision of the standard LGIA. And Seabrook gives us no reason to suppose that FERC's authority to require an effective circuit breaker at the point of interconnection is any more tenuous than its authority to

impose the standard LGIA writ large. If the entire LGIA bears a close enough relationship to FERC's authority over interstate transmission facilities, as we have held, then so do the few LGIA provisions that specifically address the maintenance of an effective circuit breaker. *See id.* at 1282.

Finally, FERC's assertion of jurisdiction over Seabrook's circuit breaker is consistent with the core statutory purpose of ensuring that different generators may safely and reliably connect to the interstate transmission system. *See S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 63 (D.C. Cir. 2014). As explained above, the parties do not dispute that unless Seabrook upgrades the breaker, Avangrid may not connect.

B

On the merits, FERC correctly construed the LGIA to require Seabrook to upgrade its circuit breaker.

Article 9.7.5 of the LGIA requires Seabrook, in compliance with "Good Utility Practice," to "provide, install, own, and maintain relays, circuit breakers and all other devices necessary to remove any fault contribution" of Seabrook "to any short circuit occurring" on the transmission system. J.A. 326. Article 9.7.5 further makes Seabrook "solely responsible to disconnect" if grid conditions "could adversely affect" the power plant. *Id.* at 326–27. Seabrook argues its duty to mitigate short circuits requires only a snapshot assessment of whether its circuit breaker is up to the task at any fixed moment in time. But as the Commission explained, Seabrook's obligation to "install" and then "maintain" a circuit breaker imposes a "continuing responsibility" to have an adequate breaker in place, which means a breaker capable of protecting Seabrook in light of changing grid conditions. *See NextEra Energy Seabrook*, 183 FERC ¶ 61,196, P 22. And given the thrust of Orders 888 and 2003—expanding independent

generators' access to the grid—such changing conditions must include the interconnection of new generators like Avangrid.

The LGIA's definition of "Good Utility Practice" reinforces this conclusion. Article 1 of the LGIA defines that phrase to include practices that, "in the exercise of reasonable judgment in light of the facts known at the time the decision was made, could have been expected to accomplish the desired result at a reasonable cost consistent with good business practices, reliability, safety and expedition." J.A. 283. Seabrook does not dispute that maintaining a circuit breaker capable of protecting its plant from fault currents is necessary to ensure safety and reliability at a reasonable cost. Nor could it, given FERC's uncontested finding that the failure of an "overdutied" breaker "could lead to catastrophic equipment failure at the nuclear facility." *NextEra Energy Seabrook*, 182 FERC ¶ 61,044, P 84. Seabrook does contend that its refusal to upgrade the breaker would prevent new generators from joining the grid and thus ensure that the breaker remains adequate. But this kind of anti-competitive behavior is hardly consistent with "good business practices." J.A. 283. And contractual provisions purporting to authorize such anti-competitive behavior would likely be unenforceable in any event. *See* Restatement (Second) of Contracts §186 (1981) ("A promise is unenforceable on grounds of public policy if it is unreasonably in restraint of trade.").

Seabrook claims that section I.3.10 of the ISO New England tariff prevents any danger of overloading the circuit breaker. That provision states that if a market participant's planned project would "have a significant adverse effect upon the reliability or operating characteristics" of facilities of another market participant, the proponent "shall not proceed to implement such plan unless" it "takes such action or constructs at its expense such facilities as the ISO determines to be

reasonably necessary to avoid such adverse effect." J.A. 724. Under Seabrook's reading, this provision forbids Avangrid from connecting the NECEC project to the grid unless and until Seabrook upgrades its circuit breaker. And because the breaker reliably protects the nuclear plant without Avangrid's power added to the grid, Seabrook currently has no duty to upgrade.

Seabrook frames its position as merely enabling it to insist on receiving full compensation for the upgrade. But Seabrook's position plainly implies that it may exclude Avangrid from the grid by refusing to upgrade its circuit breaker, no matter what compensation Avangrid offered or was ordered to pay. Even worse, the argument further implies that Seabrook may prevent interconnection by *any* new generator whose additional power would nudge its breaker from 99.6 percent of capacity to just over 100 percent. This concern is not hypothetical. After Avangrid applied to interconnect, ISO New England received many other interconnection requests— all of which it expects to "have some impact on the Seabrook Breaker," and all of which "assumed that the Seabrook Breaker will be upgraded." *Id.* 537. Although Seabrook tries to obfuscate the troubling implications of its position, the dissent acknowledges and embraces them. *See post* at 4–5.

In our view, Seabrook misreads the tariff. By its terms, section I.3.10 prevents a project sponsor from proceeding only until it "constructs at its expense such facilities as the ISO determines to be reasonably necessary to avoid" adverse impacts on other facilities. J.A. 724. That provision does not foreclose Avangrid from connecting to the grid unless and until *Seabrook agrees* to the interconnection. Instead, it merely requires *Avangrid* to *construct*, or at least *pay for*, facilities reasonably necessary to prevent its interconnection from harming other generators or transmission owners. Here, that means Avangrid must pay for an upgrade of Seabrook's circuit

breaker. Regulatory context reinforces this conclusion. As explained above, the governing tariff and LGIA implement a regime to facilitate market entry by new generators. And that requires access to the transmission grid. Giving incumbent generators a veto over new entry would frustrate that system. For these reasons, Seabrook is wrong to argue that the tariff negates its obligation to maintain the circuit breaker in anticipation of changing conditions and new entrants.

The dissent frames its analysis around the proposition that section I.3.10 of the tariff does not require Seabrook to upgrade its circuit breaker, as FERC has acknowledged. *Post* at 6 (citing *NECEC Transmission LLC*, 176 FERC ¶ 61,148, P 23 (2021)). That much is true; the duty to upgrade arises under article 9.7.5 of the LGIA, construed in accordance with the LGIA's definition of Good Utility Practice. Section I.3.10 addresses the duty to pay for the upgrade, which falls on Avangrid. The dissent chides us for giving short shrift to the text of section I.3.10. But the dissent does not explain how that provision, which requires Avangrid to "construct[] at its expense" the necessary upgrade, grants Seabrook a unilateral right to veto Avangrid's interconnection.

The dissent further says that we interpret section I.3.10 as permitting Avangrid to connect to the grid before Seabrook upgrades its circuit breaker. *Post* at 6. But as we have already indicated, we agree with the dissent on this point: Section I.3.10 clearly prohibits Avangrid from interconnecting until the new breaker is constructed. Our disagreement with the dissent centers on other points: whether article 9.7.5 of the LGIA requires Seabrook to maintain an adequate breaker as new generators join the grid (it does) and whether section I.3.10 of the tariff permits Seabrook to frustrate new entrants by refusing to upgrade the breaker (it does not).

Lastly, the dissent criticizes us for even considering statutory and regulatory purpose in construing the LGIA and the tariff. But the LGIA is no ordinary private contract; it is a standard set of terms imposed by FERC to advance the goal of Orders 888 and 2003 to foster competition in electricity markets. The dissent does not dispute that its reading of the tariff and LGIA would frustrate that goal. Yet courts should prefer textually permissible readings that would advance statutory or regulatory goals over ones that would frustrate them. *See*, *e.g.*, *Staub v. Proctor Hosp.*, 562 U.S. 411, 420 (2011) (Scalia, J.); A. Scalia & B. Garner, *Reading Law* 63 (2012) ("A textually permissible interpretation that furthers rather than obstructs a document's purpose should be favored."). These are bedrock principles of statutory construction. Our application of them here does not, as the dissent contends, smuggle into our analysis a "*Chevron*-like framework," *post* at 6.[1]

## C

In the orders under review, FERC refused to order Avangrid to reimburse Seabrook for certain indirect upgrade

---

[1] Seabrook and the dissent also invoke article 30.5 of the LGIA, which states that the agreement "does not create rights, remedies, or benefits" in favor of any third parties. J.A. 356; *see post* at 6–7 n.3. We read that provision to mean that Avangrid cannot claim status as an intended third-party beneficiary to that contract, which would enable it to sue in court for breach of contract. *See*, *e.g.*, *Brooks v. Trs. of Dartmouth Coll*, 20 A.3d 890, 900 (N.H. 2011); Restatement (Second) of Contracts § 302 cmt. a (1981). We do not read that provision—imposed by FERC in Order No. 2003—to restrict FERC's own authority to police transactions or facilities as otherwise authorized by section 201(b). Nor do we read it to cabin the reach of article 9.7.5.

costs, including legal expenses and opportunity costs in the form of lost profits. FERC reasoned that neither the ISO New England tariff nor agency precedent affords compensation for such indirect costs. *NextEra Energy Seabrook*, 182 FERC ¶ 61,044, PP 100–06; *NextEra Energy Seabrook*, 183 FERC ¶ 61,196, PP 36–46. Seabrook contends that this determination was arbitrary. We disagree.

As noted above, section I.3.10 of the tariff provides that if a new interconnection would impose a "significant adverse effect" on the systems of an incumbent generator, the connection may not proceed until the new participant "takes such action or constructs at its expense such facilities" as are reasonably necessary to avoid the harm. J.A. 724. This provision makes Avangrid responsible for the direct costs of replacing the circuit breaker, which involve "construct[ing]" the "facilities" necessary to protect Seabrook from future fault currents. But foregone profits or legal expenses cannot easily be described as the costs of constructing new facilities. Moreover, as we explained in rejecting a transmission owner's claim for outage costs, "under well-established FERC rules, all rates and charges must be clearly and specifically set forth." *S. Co. Servs., Inc. v. FERC*, 353 F.3d 29, 34 (D.C. Cir. 2003). Here, even if the tariff arguably reaches the indirect costs demanded by Seabrook, it does not cover those costs "clearly and specifically."

FERC also correctly described its own precedent, under which opportunity costs are not usually available for outages made to complete a generator interconnection. In Order No. 2003, the Commission reasoned that estimating such costs in advance is often difficult and, as a general matter, such outages "should be considered a normal part of doing business." 104 FERC ¶ 61,103, PP 714–15. FERC then clarified that a generator or transmission owner may recover for outage costs

if "the Interconnection Agreement specifically authorizes it" and if recovery is "justified on a case-by-case basis." Order No. 2003-A, 106 FERC ¶ 61,220, P 647; *see, e.g., Midwest Independent Transmission System Operator, Inc.*, 100 FERC ¶ 61,262, PP 44–46 (2002). But the threshold for finding that an interconnection agreement provides for recovery of indirect costs is high. For instance, in *Southern Company Services*, we upheld the denial of outage costs despite a provision in the interconnection agreement allowing recovery for "'all costs and expenses' in connection with 'planning, design, construction, [and] installation' of the interconnection facilities." 353 F.3d at 34. Here, neither the tariff nor the LGIA provides for any broader recovery.

Seabrook takes issue with FERC's reliance on the tariff at all. It observes that the Commission declined to rely on the tariff in finding a duty to upgrade the circuit breaker, but then invoked the tariff to determine the amount of its requisite compensation. We see no contradiction. The fact that the tariff obligates new interconnection customers to pay for direct but not indirect costs of any necessary upgrades is irrelevant to the question whether the LGIA requires incumbent generators like Seabrook to allow the upgrades.

Seabrook also invokes the "cost causation" principle, which provides that "costs are to be allocated to those who cause the costs to be incurred and reap the resulting benefits." *S.C. Pub. Serv. Auth.*, 762 F.3d at 85 (cleaned up). If the upgrade is necessary to connect Avangrid to the interstate transmission system, Seabrook reasons, then Avangrid should pay its full cost. But the tariff *does* require Avangrid to pay the full direct costs of replacing the circuit breaker. Moreover, as FERC explained, the upgrade may also be fairly described as benefitting Seabrook by allowing it to continue selling power through an integrated and expanding transmission system.

*NextEra Energy Seabrook*, 182 FERC ¶ 61,044, P 105. In any event, the cost-causation principle does not require FERC to "allocate costs with exacting precision." *Old Dominion Elec. Coop. v. FERC*, 898 F.3d 1254, 1260 (D.C. Cir. 2018) (cleaned up). And FERC has never understood that background principle generally to require compensation for indirect costs such as lost profits during interconnection outages.

Seabrook notes that, in certain limited contexts, FERC has allowed recovery of opportunity costs where necessary to eliminate perverse incentives, such as for delay. Here, though, FERC found that "there is no perverse incentive that would be remedied by opportunity costs." *NextEra Energy Seabrook*, 182 FERC ¶ 61,044, P 102. To the contrary, it concluded that Seabrook—which must manage any upgrade of its own circuit breaker—"is in the best position to ensure" that the outage period is not unduly extended. *Id.* P 105. We see no good reason to question the reasonableness of this expert and seemingly obvious judgment.

Finally, Seabrook raises the specter of "enterprise risk" from the "catastrophic consequences" of a botched upgrade. Pet. Br. at 52. On this point, the parties spar over FERC's rulings that consequential damages are generally unavailable in the interconnection context and that Seabrook did not preserve a claim for such damages in the administrative proceedings under review. *See NextEra Energy Seabrook*, 183 FERC ¶ 61,196, P 39. For the reasons explained above, we see nothing arbitrary in FERC's rulings that such damages are generally unavailable and should not be evaluated *ex ante*. Beyond that, we reserve judgment on the question whether, if the worst-case scenario imagined by Seabrook comes to pass, there would be any mechanism for further compensation based on whatever happens when the upgrade actually takes place.

19

In sum, FERC did not arbitrarily deny recovery for indirect costs at this time. The tariff does not compel such recovery, and FERC decisions make it at least generally unavailable.

## III

FERC did not exceed its statutory jurisdiction, correctly interpreted the governing tariff and LGIA, and permissibly denied Seabrook compensation for any indirect costs. We therefore deny the petitions for review.

*So ordered.*

RAO, *Circuit Judge*, dissenting: At the center of this case is a contract dispute. Is Seabrook Station required to upgrade its circuit breaker so that Avangrid can connect to the ISO New England grid? Under the plain meaning of the relevant contracts, Seabrook has no such obligation. The Federal Energy Regulatory Commission reached the opposite conclusion in order to prevent Seabrook from holding up a competitor's interconnection. The majority takes a similar approach. But under longstanding precedent, FERC must interpret tariffs and contracts according to their plain meaning, a rule that promotes stability and predictability in the provision of energy. FERC has no authority to ignore the terms of a tariff to achieve particular policy outcomes. If FERC finds the application of a tariff unjust and unreasonable, section 206 of the Federal Power Act provides a process for modifying it. Because FERC neither followed the plain meaning of the ISO New England Tariff nor modified it through a section 206 proceeding, its order should be vacated. I respectfully dissent.

I.

NextEra Energy Seabrook, LLC, owns Seabrook Station, a nuclear power plant. When Seabrook connected to the power grid, it entered into a contract with ISO New England and New Hampshire Transmission. This Large Generator Interconnection Agreement (LGIA) requires Seabrook to maintain a breaker adequate to avoid faults, consistent with Good Utility Practice. LGIA art. 9.7.5. Seabrook's circuit breaker is currently adequate but will become overloaded if more entrants connect to the grid. Avangrid, a competitor to Seabrook, seeks to connect its New England Clean Energy Connect (NECEC) project to the grid. The ISO New England Tariff provides detailed rules governing new interconnections. In particular, section I.3.10 prevents interconnections until a new entrant "constructs at its expense" any facilities the ISO determines are "reasonably necessary to avoid" the "adverse effect[s]" caused by the interconnection. ISO New England

identified upgrading Seabrook's breaker as the only technologically feasible way to avoid an adverse effect from Avangrid connecting.

Seabrook and Avangrid disagree about what obligations the LGIA and Tariff place on Seabrook to upgrade its breaker. FERC concluded that Seabrook would violate article 9.7.5 of the LGIA if it did not upgrade its breaker, and the majority agrees.

## II.

Under the Administrative Procedure Act, we "decide all relevant questions of law." 5 U.S.C. § 706. We interpret FERC tariffs like contracts and "must enforce unambiguous tariff language." *Long Island Power Auth. v. FERC*, 27 F.4th 705, 716 (D.C. Cir. 2022). Because contract interpretation is a question of law, we do not defer to agencies.[1] *See Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2265 (2024). Our task is not to interpret with an eye to policy, but simply to "determine the plain meaning of" the tariff. *Ameren Servs. Co. v. FERC*, 330 F.3d 494, 499 (D.C. Cir. 2003); *see also Idaho Power Co. v. FERC*, 312 F.3d 454, 462 (D.C. Cir. 2002) ("The fact that FERC's order[] directly conflict[s] with the plain meaning of the tariff alone merits a reversal.").

The majority and the Commission conclude that Seabrook would breach the LGIA if it declined to upgrade its breaker. The problem with this interpretation, however, is that neither

---

[1] While we have never deferred to agencies' interpretation of unambiguous contracts, we sometimes afforded *Chevron*-like deference to FERC's interpretation of ambiguous contracts. *See Ameren Servs. Co. v. FERC*, 330 F.3d 494, 498–99 (D.C. Cir. 2003). That practice, however, is incompatible with the Supreme Court's recent decision in *Loper Bright*.

the Tariff nor the LGIA requires Seabrook to upgrade its breaker to accommodate Avangrid's connection. Without a contractual obligation to upgrade, Seabrook cannot be in violation of the LGIA.[2]

I begin with the text of the relevant contracts—the Tariff and the LGIA. The Tariff details the parties' rights and obligations with respect to a new interconnection. Section I.3.10 of the Tariff provides that a new project like Avangrid's cannot interconnect until it "constructs at its expense such facilities as the ISO determines to be reasonably necessary to avoid [any identified] adverse effect." Only when a new project satisfies the requirements of section I.3.10 will it "have the right to be interconnected." Tariff § II.47.5. Everyone agrees that if Avangrid connects, Seabrook's breaker will be overloaded, and so "Avangrid cannot connect to the grid unless and until Seabrook upgrades the breaker." Majority Op. 6.

While an upgrade is necessary for Avangrid to connect, the Tariff imposes no duty on Seabrook to agree to the upgrade. Neither FERC nor the majority point to any such provision in the Tariff. In fact, the Tariff provision that imposes a duty on some incumbents to upgrade does not apply to Seabrook. As FERC correctly concluded, that provision applies only to "Network Upgrades," a defined term that does not include upgrades to generation facilities like Seabrook Station. *NextEra Energy Seabrook, LLC*, 182 FERC ¶ 61,044, P 76 (2023) (interpreting, in relevant part, Tariff Schedule 25, § 3.2.2.1). The natural consequence of having no contractual duty to upgrade is that Seabrook may exercise veto power, because upgrades to Seabrook's breaker are a condition precedent to Avangrid's interconnection.

---

[2] Because I find Seabrook has no contractual obligation to upgrade, I need not address the allocation of indirect costs for such an upgrade.

Indeed, FERC recognized that this was the most natural reading of the Tariff when, one year into this three-year proceeding, the Commission initiated a parallel section 206 proceeding and solicited proposed modifications to the Tariff. As FERC explained, the Tariff "could create the situation where" an interconnection could not occur until an upgrade is made to "an existing generator," like Seabrook, but the Tariff "does not require the existing generator to take action with respect to" that upgrade. *NECEC Transmission LLC*, 176 FERC ¶ 61,148, P 23 (2021). Under this reading, the Tariff "may be unjust and unreasonable." *Id.* FERC realized that the Tariff allowed for the type of hold up problem present in this case and that, to address the problem, the Tariff would need to be modified. The majority agrees: "the tariff does not require Seabrook to upgrade its circuit breaker." Majority Op. 14.

Once we recognize that the Tariff imposes no obligation on Seabrook to upgrade, and that the Tariff prevents Avangrid from connecting unless Seabrook agrees to make the upgrades, there can be no violation of the LGIA if Seabrook chooses not to upgrade. Under article 9.7.5 of the LGIA, Seabrook must maintain an adequate circuit breaker; but Seabrook's breaker is currently adequate.

Reading the Tariff and the LGIA together, Seabrook has no duty to upgrade in order for Avangrid to connect. If Seabrook refuses to upgrade, then under the Tariff, Avangrid cannot connect, and the breaker will remain adequate. The only scenario in which Seabrook's breaker would be overloaded—if Avangrid interconnects but Seabrook does not upgrade—is expressly foreclosed by the Tariff.

III.

Neither FERC nor the majority grapple with the plain meaning of the contracts. Their conclusion that Seabrook must

upgrade for Avangrid's connection ultimately depends on policy concerns about ensuring competition and open grid access. Yet policy concerns cannot rewrite the terms set in the Tariff and the LGIA.

FERC's orders focus on the policy problem of allowing Seabrook to have veto power over Avangrid's connection. Notably, FERC did not refute Seabrook's argument about Tariff section I.3.10, namely that Avangrid's interconnection "cannot occur until Seabrook's breaker is replaced." *NextEra Energy Seabrook, LLC*, 183 FERC ¶ 61,196, P 23 (2023). Instead, FERC expressed "concern" that Seabrook was "exercising veto power over the interconnections of new and competing interconnection customers." *Id.* With no consideration of the import of Tariff section I.3.10, FERC assessed what would happen if Avangrid connected before Seabrook upgraded. FERC found that Seabrook's "breaker will be overdutied *following* [Avangrid's] authorized interconnection" and that the Good Utility Practice "standard would be violated if Seabrook failed to replace the breaker *prior to* energization of [Avangrid's] Project." *Id.* at PP 21, 24 (emphases added). The problem FERC sought to avoid, however, is unambiguously foreclosed by Tariff section I.3.10.

The majority's primary argument is that the LGIA requires Seabrook to "maintain" an adequate breaker and this imposes a "continuing responsibility" to upgrade its facilities when there are changes to the grid. Majority Op. 11. Yet that still leaves the question of whether Avangrid's new connection is the type of change that *requires* Seabrook to make an upgrade.

On this key question, the majority cannot point to any contractual provision and so must rely on policy concerns about equal access to the grid and the ipse dixit that "changing

conditions *must include* the interconnection of new generators." Majority Op. 12 (emphasis added).

The majority's conclusion also rests on the premise that, despite section I.3.10 of the Tariff, Avangrid may connect before Seabrook's breaker is upgraded and cause an overload. But this premise is contrary to both Seabrook's and Avangrid's reading of the Tariff and relies on a Tariff interpretation that the Commission never expressed. In fact, FERC has recognized that when the necessary upgrade must be made to an existing generation facility such as Seabrook Station, the Tariff does not impose any requirement on that facility to make the upgrade. *NECEC Transmission LLC*, 176 FERC ¶ 61,148, P 23 (2021). Because the Tariff also plainly prevents Avangrid from interconnecting until after Seabrook's breaker upgrade is constructed, there is no risk of an overloaded breaker.

Finally, the majority reverts to a *Chevron*-like framework, insisting its interpretation is "textually permissible" and consistent with regulatory goals. Even assuming for a moment the majority's interpretation is permissible, which it is not, it is certainly not the *best* interpretation because it does not account for section I.3.10 of the Tariff. And if an interpretation "is not the best, it is not permissible." *Loper Bright Enters.*, 144 S. Ct. at 2266.

Whether Seabrook having veto power "would frustrate" the interconnection process and whether that veto power is inconsistent with the policy goals of other FERC orders are irrelevant to the court's interpretive task, which requires enforcing the "plain meaning" of FERC tariffs.[3] *Ameren Servs.*

---

[3] In any event, the majority reads the purposes of the LGIA too broadly. FERC has undoubtedly sought to promote competition, but the LGIA furthered that goal in a specific way by "preventing transmission facility owners from favoring affiliated generators over

*Co.*, 330 F.3d at 499. It is improper to overrule the plain meaning by "say[ing] that since the overall purpose of the [contract] is to achieve *x*, any interpretation of the text that limits the achieving of *x* must be disfavored." A. Scalia & B. Garner, *Reading Law* 168 (2012).

Moreover, the LGIA is governed by New Hampshire law, which similarly requires following the ordinary meaning of contracts. LGIA art. 14.2.1; *Greenhalgh v. Presstek, Inc.*, 886 A.2d 1000, 1003 (N.H. 2005). Neither FERC nor the majority provide an explanation for why *federal energy policy concerns* are relevant to finding the plain meaning of the LGIA under New Hampshire law. Because there is no contractual duty in the Tariff or the LGIA that prevents Seabrook from exercising veto power, FERC cannot impose one through interpretation.

But FERC is not without authority to address what it considers an undesirable hold-up problem. FERC may initiate a section 206 proceeding and modify the Tariff if the Commission determines its plain meaning is "unjust, unreasonable, unduly discriminatory or preferential." 16 U.S.C. § 824e(a). If Seabrook having veto power over new entrants is—as it may well be—unjust and unreasonable, FERC can modify the Tariff to eliminate Seabrook's veto power. Because FERC reached the policy outcome it desired by departing from the plain meaning of the Tariff, it abandoned the section 206 proceeding it had initiated. *NextEra Energy Seabrook, LLC*, 183 FERC ¶ 61,196 at P 50.

---

independents in interconnection." *Nat'l Ass'n of Regul. Util. Comm'rs v. FERC*, 475 F.3d 1277, 1279 (D.C. Cir. 2007). The goal of fostering competition does not extend to third parties like Avangrid because the LGIA plainly states that it is "not intended" to "create rights, remedies, or benefits" for third parties. LGIA art. 30.5.

The broader regulatory context and policy concerns cited by the majority may be relevant to FERC's determinations when *setting* just and reasonable rates and practices. These considerations, however, are impermissible for the judicial task of identifying the plain meaning of *existing* tariffs and contracts.

\* \* \*

FERC possesses fairly sweeping authority to approve and prospectively modify tariffs under a just and reasonable standard. Once those tariffs are set, however, they are binding contracts that must be enforced according to their plain meaning, and FERC cannot retroactively change them. *Okla. Gas & Elec. Co. v. FERC*, 11 F.4th 821, 829 (D.C. Cir. 2021) (discussing the filed rate doctrine). The ordinary meaning of a tariff provides vital notice to regulated parties about what is required and allows those parties to order their business accordingly.

Leaning heavily on policy concerns, the majority allows FERC to deviate from the terms of a tariff. This has the same effect as a retroactive change, which the Supreme Court has recognized "could have an 'unsettling effect on other … transactions' and would have a 'potential for disruption of … markets.'" *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 579 (1981) (quoting *Ark. La. Gas Co. v. Hall*, 13 FERC ¶ 61,000, 61,213 (1980)).

Prospective changes to the Tariff must be pursued in a section 206 proceeding, which protects the reliance interests of regulated parties. Before modifying a tariff, FERC must find the "existing rates … to be entirely outside the zone of reasonableness." *City of Winnfield v. FERC*, 744 F.2d 871, 875 (D.C. Cir. 1984) (Scalia, J.). And section 206 requires FERC to exercise its policymaking authority with regulatory

protections such as notice to affected parties and a hearing. 16 U.S.C. § 824e(a). The abandoned section 206 proceeding in this case, for example, prompted dozens of filings from public and private entities. *See In re ISO New England*, FERC Docket No. EL21-94-000. Following the section 206 process would have also allowed FERC to consider more fully the consequences of modifying the Tariff, such as the other issue in this case: how the costs of any required upgrades should be allocated.

Because the Tariff and the LGIA imposed no obligation on Seabrook to upgrade its facilities to allow Avangrid to connect, I would grant Seabrook's petition and vacate FERC's order.